UNITED STATES, Appellant

v

RONALD F. CUTHBERT, Private E–2, U. S. Army, Appellee

11 USCMA 272, 29 CMR 88

*First Lieutenant George J. Miller* argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy*.

*Cecil Davenport, Esquire,* and *Henry A. Triplett, Esquire,* argued the cause for Appellee, Accused.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The board of review reversed the accused's conviction[1] of two specifications of tampering with the United States mail, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934, on the ground that evidence was admitted at the trial in violation of Article 31 of the Uniform Code, 10 USC § 831. The Judge Advocate General of the Army certified the case to this Court for review of the following questions:

1. Under the facts of this case, was the accused's commanding officer required to warn the accused pursuant to Article 31, Uniform Code of Military Justice, prior to the discovery of the incriminating evidence?

2. If the first certified question is answered in the affirmative, was the Board of Review correct in holding that because he had not been warned pursuant to Article 31, Uniform Code of Military Justice it was error to admit into evidence the letters produced by the accused in compliance with the instruction of Captain Campbell?

The accused was assigned to duty at the Postal Locator office, Fort Knox, Kentucky. On November 24, 1958, he was seen by Specialist Cates, a fellow postal worker, to hold a letter to the light; lay it aside briefly; pick it up again, and put it into his pocket. The accused then walked toward the latrine at the end of the room. Cates reported the incident to Corporal Carder, the noncommissioned officer in charge. In turn, Carder informed Captain J. F. Campbell, who was the commanding Officer of the 566th Army Postal Unit, and who, as one of his functions, had charge of the operation of the Postal Locator office.

Campbell proceeded to a small hallway at the rear of the building where "most of the men hang their jackets while working." One of the jackets was pointed out to him as the accused's. He "felt . . . several" of the pockets of the jacket, and in one he "felt bulky paper material." Captain Campbell was looking for mail matter. However, before he could extract the matter from the accused's jacket pocket, the accused appeared on the scene. He said that he was chilly, and he wanted his jacket. The Captain stepped back; the accused removed the jacket from the hook, and put it on. Campbell then asked him "to step into the nearby supply room." The accused did so, accompanied by Captain Campbell and Corporal Carder. What transpired next is best told in the following excerpt from Captain Campbell's testimony:

---

[1] CM 402194.

**273**

". . . I told Cuthbert he had been observed putting mail in his pocket and I would like for him to empty his pockets. Immediately he threw a letter up on a nearby packing crate. I asked him if he had any other letters, and he said, 'No.' I told him to empty the rest of his pockets, and then several letters appeared, none of which were addressed to Cuthbert and one which had been opened. I at that moment told Cuthbert to remain in the supply room, and also instructed Corporal Carder to remain in the supply room. I went to the other end of the building and into my office and called the 34th CI and spoke to Mr. Sackett, an agent, and told him what had taken place and asked him to come over to my organization and conduct the investigation.

.   .   .   .   .

"Q. [IC]. When you took Cuthbert back into the supply room and you asked Cuthbert about this matter, did you feel that your question called for an answer or explanation?

"A. Not necessarily. I don't feel so, no. I told him he had been observed putting mail in his pocket, and I instructed him to empty his pockets."

In an out-of-court hearing on the admissibility of the letters taken from the accused, individual defense counsel conceded that Campbell had authority to conduct a search; however, he maintained that the letters were not obtained as a result of a search, but as a result of interrogation of the accused, and were inadmissible because the accused was not preliminarily advised of his rights under Article 31. The law officer overruled the objection on the ground that it appeared from the evidence that "the operation [Captain Campbell] conducted" was a search. When the case came before the board of review, it concluded the situation was substantially similar to that in United States v Nowling, 9 USCMA 100, 25 CMR 362. On the authority of that case, the board of review held the letters were inadmissible because the accused was not first advised of his rights under Article 31, and it set aside the findings of guilty.

**274**

The board of review's reliance upon the decision in *Nowling*, supra, is inaccurate. In that case an air policeman suspected the accused of not having a pass in his possession. Consequently, he approached the accused and asked to see his pass. The accused produced a pass which bore a name that did not correspond to the name on his ID card. He was taken into custody. We held that inasmuch as the accused was suspected of a violation of the Uniform Code, it was incumbent upon the policeman to advise the accused of his rights under Article 31 before asking him to produce the pass. We expressly noted there was no arrest and no search as an incident thereto. This observation is important here.

In the *Nowling* case there was no question of a lawful search predicated upon probable cause; however, that is the specific issue in this case. In United States v Insani, 10 USCMA 519, 520, 28 CMR 85, we pointed out there can be an "interrogation without a search, and, conversely, a search without interrogation." Evidence obtained as a result of a lawful search is not inadmissible because the accused is not first warned of his rights under Article 31. In *Nowling* the police officer was simply interrogating the accused to confirm or refute his suspicion that he had no pass. The evidence in this case shows clearly that Captain Campbell was engaged in a search of the accused's person and effects. As a preliminary to that search he was not required to warn the accused of his rights under Article 31. United States v Insani, supra. The accused was not asked to identify his clothing, and he was not directed to do anything but comply with the terms of the search. Cf. United States v Taylor, 5 USCMA 178, 17 CMR 178. At trial, defense counsel conceded, and the evidence clearly shows, that Captain Campbell was authorized to conduct the search.

The board of review, therefore, erred as a matter of law in holding the letters to be inadmissible. Accordingly, we answer the first certified question in the negative, and it is unnecessary to an-

swer the second. The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for submission to the board of review for further proceedings consistent with this opinion.

LATIMER, Judge (concurring):

I concur.

In one of our early cases, United States v Florence, 1 USCMA 620, 5 CMR 48, this Court unanimously adopted the longstanding civilian rule that searches incident to lawful arrest are legal. The validity of that principle is undisputed, and no useful purpose would be served by dwelling on its history here. However, the interested reader may trace the development of the rule through the cases cited in that opinion. And more recently in United States v Dutcher, 7 USCMA 439, 22 CMR 229, while a majority of the Court there decided the question on a different ground, I relied upon the same rule in resolving the issue that confronted us.

In my view, the above cases are controlling here, for if in those instances there was a legal search incident to lawful apprehension, necessarily the same is true in the case at bar. Here the accused was assigned for duty and working at the Postal Locator. As the Chief Judge points out, the commanding officer thereof, who was aware that accused had been observed abstracting a letter from the mail and of other suspicious circumstances, told him to step into the supply room, informed him he had been seen putting mail in his pockets, and instructed him to empty the same. Certainly there can be no question but that the officer had probable cause to and in fact did apprehend the accused. Nor can there be any doubt that the latter was well aware his freedom of movement had been restricted because he was suspected of stealing mail. In light of these circumstances, it is beyond cavil that there was authority to search accused—in fact, individual defense counsel conceded this to be so. The only question, then, is whether the acts here constitute a search, and, again, I believe *Florence* and *Dutcher* are

dispositive. It should be obvious under the posture of this record that instructing or asking an accused to empty his pockets in lieu of a "frisking" by apprehending authorities, does not militate against a search. Rather, it was certain accused would be required to give up any incriminating evidence he possessed—whether with or without his consent—and the manner employed was merely a less offensive method of accomplishing the same end. Certainly in view of the courtesy extended him, the accused should be the last to complain of the method used to obtain possession of the letters. To remove all question, however, I point out that in the two aforementioned cases, Florence was "requested to produce . . . [his] wallet" (1 USCMA at page 622); and Dutcher was asked if he minded going through his billfold and was directed to do so himself (7 USCMA at page 440). As both those situations were searches, manifestly the same is true in this instance. And since it is unnecessary to warn an accused in accordance with the provisions of Article 31, Uniform Code of Military Justice, 10 USC § 831, in order to obtain his consent to a search, United States v Insani, 10 USCMA 519, 28 CMR 85, I am unable to determine wherein any of this accused's rights have been impinged.

Accordingly, I join the Chief Judge in reversing the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

By affirming accused's conviction on the record before us, I believe that my brothers effectively reverse United States v Nowling, 9 USCMA 100, 25 CMR 362, and overlook the really significant issue included in the two questions certified by the Acting The Judge Advocate General of the Army. Unfortunately, the result is that Uniform Code of Military Justice, Article 31, 10 USC § 831, is not given "a liberal and enlightened, [but] rather . . . a narrow and grudging, application." United States v Minnifield, 9 USCMA 373, 26 CMR 153.

Tried by general court-martial, the accused was found guilty of two specifications of tampering with mail matter, in violation of Code, supra, Article 134, 10 USC § 934. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year. The convening authority approved the sentence and forwarded the record of trial for review. The board of review set aside the findings and sentence and ordered the charges dismissed in the belief that certain evidence was admitted at the trial in violation of the provisions of Code, supra, Article 31. The Acting The Judge Advocate General of the Army certified the following questions to this Court:

Under the facts of this case, was the accused's commanding officer required to warn the accused pursuant to Article 31, Uniform Code of Military Justice, prior to the discovery of the incriminating evidence?

If the first certified question is answered in the affirmative, was the board of review correct in holding that because he had not been warned pursuant to Article 31, Uniform Code of Military Justice it was error to admit into evidence the letters produced by the accused in compliance with the instruction of Captain Campbell?

Accused was assigned to the Postal Locator office, Fort Knox, Kentucky. Another postal worker observed him holding a letter to the light. Subsequently, accused placed the letter in his pocket. The matter was immediately reported to Captain J. F. Campbell, Commanding Officer, 566th Army Postal Unit, and Officer in Charge, Postal Locator office. Campbell located accused's jacket in a nearby hallway and, by feeling the pockets, determined that they contained "bulky paper material." Accused appeared and put on his jacket. Captain Campbell asked him to step into the supply room and described the events which subsequently occurred in the following language:

"WITNESS (CAPT CAMPBELL): It was reported to me by Corporal Carder, an NCO in my organization, that Private Cuthbert had been observed putting mail in his pockets. I went to the rear of the building.

. . . . .

"Q. Continue, please, Captain.

"A. I accompanied Corporal Carder to the rear of the Post Locator Building to a small hallway where most of the men hang their jackets while working. I checked several of Cuthbert's blouse pockets and in an upper pocket I felt bulky paper material. About this time Cuthbert appeared behind me and stated he wished to put his jacket on as he was a little chilly. I stepped back and permitted him to take his jacket from the hook, he put it on, and buttoned it up. At this particular time I asked him to step in the nearby supply room. Corporal Carder also accompanied me into the supply room with Cuthbert. When we entered the supply room I told Cuthbert he had been observed putting mail in his pocket, and I instructed him to empty his pockets.

. . . . .

"Q. Captain Campbell, if you will continue now from the point where you had the accused go back in the supply room with you.

"A. I asked him to step into the supply room. After we entered the supply room, Cuthbert, Corporal Carder, and myself, I instructed Cuthbert to empty —*I told him he had been observed putting mail in his pocket, and then I instructed him to empty his pockets. He immediately withdrew a letter.*

. . . . .

"WITNESS (CAPT CAMPBELL): Cuthbert immediately withdrew a letter from his blouse pocket and threw it on a packing crate. The letter was not addressed to Cuthbert; it had not been opened. *I asked him if he had any other letters.*

. . . . .

"WITNESS (CAPT CAMPBELL): *He stated, 'No', he did not,* and then I told him to empty the rest of his pockets, and then when he began to do this, why he dropped approximate-

276

ly eight or nine letters on the packing crate.

. . . . .

"Q. Captain, what question did you ask when the accused was in the supply room?

"A. When he threw the one letter out on the packing crate, *I looked at it, frowned, and I said, 'You know better than this?' and he said, 'Yes', and he was very apologetic.*

"Q. Did you ask any more questions?

"A. No, *I asked him at the time if he had any more letters, and he said, 'No', and then I instructed him to empty the balance of his pockets.*" [Emphasis supplied.]

Captain Campbell instructed the accused to remain in the supply room and notified the local Criminal Investigation Detachment of the incident. Thereafter, a Mr. Sackett arrived and took charge of the investigation. Prior to Mr. Sackett's arrival, the accused was at no time informed of his rights under Code, supra, Article 31. Individual counsel made appropriate objections to the introduction of the foregoing testimony, and, indeed, trial counsel indicated during an out-of-court hearing that he did not intend to present accused's statements to Captain Campbell in evidence. That he did so in spite of his contrary assertion is established beyond peradventure by the quotation from the record. The letters obtained from the accused were also received in evidence over proper objection.

Initially, I note that my brothers seem to treat the separate questions forwarded by the Acting The Judge Advocate General as presenting only an inquiry into the admissibility of the letters. A reading of the opinion of the board of review in this case causes me to attribute a broader meaning to the certified issues. The board specifically ruled on the admissibility of accused's answers to Captain Campbell's questions, and I believe the certification is designed to obtain our views both upon its conclusion that the interrogation of the accused was inadmissible and the utilization in evidence of the seized letters. Certainly, it is unreasonable to assume that General Jones intended to ask the same question twice, although that implication is surely involved in the treatment accorded the issues by the principal and concurring opinions.

Because of the majority's approach, I find only silence in my brothers' opinions concerning the questions put to the accused by Captain Campbell and the receipt of the former's answers in evidence. As I believe the issue demands separate treatment and in itself requires reversal, I shall discuss it apart from the search and seizure.

At the outset, it should be understood that the record clearly reveals that Captain Campbell suspected the accused of tampering with mail matter. He admitted as much in his testimony, and his declaration is given force by the report made to him by Corporal Carder. United States v Wilson, 2 USCMA 248, 8 CMR 48. Moreover, it is equally clear he was acting "officially," assuming that such a narrowing qualification is required in order to demonstrate a violation of Code, supra, Article 31. See the concurring opinion of Judge Latimer, United States v Souder, 11 USCMA 59, 28 CMR 283. It is admitted by all concerned that no one advised the accused of his rights under the Article. Nevertheless, there was received in evidence, over appropriate objection, accused's statements to Captain Campbell that he knew "better than this" and that he had no other letters in his possession, the latter declaration being immediately refuted by production of "eight or nine letters." Certainly, both of these statements are incriminatory, for they demonstrate accused's consciousness of the wrongful character of his possession of the mail matter and tend to establish, as alleged in the specifications, that he "did . . . unlawfully . . . secrete" the items found. And if it be argued that his misconduct was otherwise so strongly established by the prosecution that the admissions thus obtained fade into insignificance, I can only answer that we have unhesitatingly refused to apply the doctrine of compelling evidence as curative of violations of Code, supra,

Article 31. United States v Williams, 10 USCMA 578, 28 CMR 144. In short, I find what we said in United States v Kelley, 7 USCMA 584, 23 CMR 48, at page 588, peculiarly applicable here:

". . . When during a trial—whether an admission or confession—it is perfectly obvious that a statement has been secured in violation of Article 31, it should not be admitted."

It is certain that in this case admissions were received in evidence in defiance of the Article's mandate. The issue has been properly preserved for our scrutiny, and, in my opinion, we must, under the precedents laid down in this Court, hold that, "Under the facts of this case, . . . the accused's commanding officer [was] required to warn the accused pursuant to Article 31, Uniform Code of Military Justice, prior to the discovery of the incriminating evidence." Accordingly, I would answer the first certified question in the affirmative.

With respect to the second inquiry before us, I suggest that the situation presented in this record is, insofar as legal considerations are concerned, precisely the same as that before us in United States v Nowling, supra. In that case, the accused was charged with wrongful possession of an unauthorized pass with intent to deceive. During the early morning hours of November 15, 1956, an air policeman observed the accused in the Air Police Operations office. He was being booked for a uniform violation. Under such circumstances, it was the standard practice to revoke the individual's pass. During the evening of the same day, the air policeman observed the accused in an off-post night club. He "strongly suspected" accused did not have a pass. Accordingly, he approached him outside the club and asked to see his pass. The accused displayed one which turned out to be unauthorized. Defense counsel at the trial objected to the receipt of the pass in evidence on the ground that the air policeman had failed to advise the accused of his rights under Code, supra, Article 31, although he suspected him of having

**278**

committed an offense. We granted review in that case solely on the issue of whether the law officer acted correctly in overruling the defense objection *and admitting the pass in evidence.* In holding that it was prejudicially erroneous so to receive the pass, we stated, at page 102:

"The language of Article 31, supra, is clear and unequivocal. Section (b) provides that no person subject to the Code shall interrogate or request any statement from 'an accused or a person suspected of an offense' without first advising him of his rights under the Article. Any statement obtained 'in violation of this article' is inadmissible in evidence. Section 31(d), supra. While it is true that here there was no request that the accused make a statement, there was, however, a request that he produce identification. *The distinction between oral declarations and physical acts for the purpose of requiring a warning under the Article has been specifically rejected by the Court. . . . We conclude, therefore, that the accused's conduct in producing the pass at the request of the air policeman was the equivalent of language which had relevance to the accused's guilt because of its content.*" [Emphasis supplied.]

In the instant case, we find that Captain Campbell, accused's commanding officer, was informed that accused had pocketed mail matter. His suspicions having been aroused, he cornered Cuthbert and ordered him to turn over any letters in his possession. He did so without prior warning under Code, supra, Article 31. Seemingly, then, the rule set forth in United States v Nowling, supra, would apply, and bar the admission of the letters in evidence. The author of the principal opinion, however, suggests that there are different considerations present here.

The Chief Judge initially states it is "important" to observe that we expressly noted in United States v Nowling, supra, that the facts involved no arrest and no search incident thereto. What we stated is found at page 104:

"We are not impressed by the

Government's argument that had the accused refused to produce the pass, he could have been searched and its presence discovered. This argument falls wide of the mark for the truth of the matter is that there was no lawful arrest present."

The evidence in that record demonstrated the accuracy of that statement, for the air policeman merely detained the accused on the street and demanded that he produce his pass. The same truth is demonstrated, however, in this record, for, contrary to Judge Latimer's belief, it also reflects that Captain Campbell merely *detained* accused in the hallway and supply room while he investigated his suspicions. He did not take accused "into custody" until he directed him to remain in the supply room. This occurred *after* the completion of his inquiry into accused's possession of mail matter. Moreover, I know of no basis for holding that the warning requirement of Article 31, supra, does not apply because the accused was placed under arrest prior to his interrogation. Indeed, the contrary is indicated by the statute's terms, for it states that it applies only when persons are *accused* or *suspected* of having committed an offense. Finally, I point out that the quoted portion of the opinion in United States v Nowling, supra, forms no part of the holding in that case. It merely sets forth a reason for rejecting a Government argument without deciding whether there were other bases for giving it no attention. Courtesy to appellate counsel demanded no less than we said in *Nowling*, supra, but polite references to arguments before us should not be converted into positive law.

In addition to his incidental reference to searches incident to lawful arrests, the Chief Judge states that the "accused was not asked to identify his clothing, and he was not directed to do anything but comply with the terms of the search." True it is he was not required to point out his jacket, but I suggest that this fact is essentially a negative consideration. One can say with equal positiveness that the record does *not* demonstrate that accused was beaten, flogged, or threatened. Our principal interest, however, is in determining that which the accused was *positively* required to do rather than to eliminate factors not involved in the case. In this respect, Captain Campbell's testimony leads only to one conclusion. Accused was ordered, without warning, to produce any mail matter which he might have in his pockets. As United States v Nowling, supra, also involved only an order by an air policeman that the accused *produce* his incriminating pass, I fail to see how that decision may be rationally distinguished. It is certainly true that Campbell, as accused's commanding officer and acting upon probable cause, might legally search accused's person and belongings. However, when accused is personally required to act in the production of evidence against himself, Article 31, supra, comes into play, and affords protection. It is to prevent such compelled affirmative incriminatory action by the accused that the Article was enacted, United States v Rosato, 3 USCMA 143, 11 CMR 143, and the distinction between personal production of the contents of accused's pockets and an authorized search by a third party is clear.

In sum, then, I believe that Captain Campbell was required to inform the accused of his rights under Code, supra, Article 31, prior to demanding the personal production of the letters in question and prior to interrogating him concerning the matter. As in each instance, he failed to give the necessary warning, I am of the opinion that it was prejudicially erroneous to admit evidence of accused's statements and the letters seized from him. In reaching the opposite conclusion, I fear that my brothers only take one more step in "a gradual whittling away of an accused's most important safeguard until nothing is left of it but a heap of bare bones." United States v Minnifield, supra, at page 379. Those who do not believe that the scope of this important protection— often the sole shield between a military suspect and the efforts of overzealous superiors—is being tragically narrowed, need only compare this opinion and our recent decision in United States v Vail, 11 USCMA 134,

28 CMR 358, with what was said in United States v Minnifield, United States v Kelley, and United States v Nowling, all supra.

I would answer the certified questions in the affirmative and uphold the decision of the board of review.