UNITED STATES, Appellant

v

WILLIAM K. HARMAN, Private, U. S. Army, Appellee

12 USCMA 180, 30 CMR 180

No. 14,407

Decided February 10, 1961

*First Lieutenant Alvin B. Fox* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel Gilbert G. Ackroyd* and *Lieutenant Colonel James G. McConaughy.*

*First Lieutenant Burnett H. Radosh* argued the cause for Appellee, Accused. With him on the brief were *Colonel Harley A. Lanning* and *Lieutenant Colonel W. H. Blackmarr.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Accused was convicted by general court-martial for the barracks larceny of $31.00 from a fellow soldier, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to confinement at hard labor for twelve months, forfeiture of all pay and allowances for that same period, and reduction to the grade of recruit. The convening authority reduced the forfeitures to $50.00 per month for twelve months, but otherwise approved the sentence. However, the board of review held the law officer had erred in admitting accused's pretrial confession into evidence, set aside the findings and sentence, and ordered the charge dismissed. Thereafter, The Judge Advocate General of the Army certified the case to this Court under the provisions of Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, requesting us to determine whether the board of review was correct in holding that the law officer erred. Parenthetically, we note that The Judge Advocate General, upon certifying the case, remitted the unexecuted portion of accused's sentence.

At trial, it was established that the victim of this theft and accused were both billeted in the same barracks. Upon retiring on the evening in ques-

tion, the victim had placed his billfold, which contained $31.00 in currency, inside his pillow case. Next morning, when he awoke, he found his wallet lying on the floor and his money was gone. No one had permission to take the money. After the undisputed testimony recounted above had been adduced, the prosecution offered in evidence a pretrial confession accused had executed on the afternoon the theft was discovered. The law officer allowed it to be admitted over objection by the defense, and thereafter both parties rested. It is the propriety of that ruling with which we are here concerned.

Defense counsel contended that accused's confession was involuntary and hence inadmissible, for the reason that it was the direct result of a prior illegal search and seizure, and an illegal interrogation. The bulk of this trial transcript is devoted to the defense efforts to substantiate that argument and the prosecution's opposition thereto, and it is apparent that the defense turned primarily on the voluntariness of the confession, for if it was allowed in evidence and given weight by the court-martial, the evidence of guilt is compelling. The testimony adduced which bears on the defense objection is hereinafter generally stated.

This offense occurred in a Replace-

ment Detachment and the barracks which was the locus of the theft housed casuals, at least some of whom—including accused—were on orders for transfer that afternoon to permanent units. When the victim arose and found his money gone, he arranged with the fire guard to secure the building while he reported his loss to the charge of quarters at the orderly room. At about six o'clock, before breakfast, the Duty Officer and two sergeants had the occupants of the barracks lay out their equipment and inspected the wallets of each in an attempt to find the stolen currency. They were unsuccessful but, after the morning meal, the detachment commander directed that criminal investigation agents be called in and that another full scale search be conducted. The barracks was again secured, and this second search commenced around 9:00 a.m. It was the intention of the investigating party thoroughly to search the entire barracks and those billeted therein, but inasmuch as accused had been previously identified by a guard as the person he had seen the night before removing the victim's pillow from his bunk, it was suggested that the operation start with him. One Sergeant Hawkins, the acting platoon sergeant, was to perform the actual search. Neither he nor the other members of the searching party knew where accused's bunk or wall locker were located, but Hawkins had with him a roster listing the bunk numbers of those billeted in the barracks, each of whom was assigned a locker with a corresponding number.

Without warning him in accordance with Article 31, Uniform Code of Military Justice, 10 USC § 831, Hawkins directed accused to point out his bunk and get his equipment. Accused substantially complied, by getting his duffel bag—which was clearly marked with his name and serial number—from his wall locker, and placing it on the end bunk. He removed the padlock that secured the bag and thereupon Hawkins commenced to search through the contents of the duffel bag. In a pocket of one of the first garments he inspected—a fatigue jacket marked with accused's name—he found a roll of bills in the identical denominations and sum as the missing currency. As soon as the money was found, at about 9:30 a.m., accused was, for the first time, warned by a criminal investigator of his rights under Article 31, and then taken, after a short stop at the orderly room, to the provost marshal's office. He was not interviewed there until after he had his lunch, when, at about 1:00 p.m., he was again properly warned of his rights. By approximately 2:20 in the afternoon accused executed the written confession which is the subject of the certified question.

Until the stolen currency was found accused had denied any knowledge of or complicity in the theft, and during his questioning at the provost marshal's office the clothing from which the money was recovered was kept in plain view, and the interrogator made reference to the fact that the money had been found. Further, accused in his testimony regarding the voluntariness of his confession, stated categorically that he would not have admitted the theft had the money not been found.

The foregong evidence was elicited solely for the purpose of determining the collateral question of the voluntariness of the accused's confession and was brought before the court wholly by the defense tactics at trial. The Government did not attempt to use any of that testimony on the merits nor was the money introduced. The law officer overruled defense counsel's objection, admitting the confession in evidence, but he emphatically admonished the court members that the evidence relating to the search and seizure bore only on the question of the voluntariness of accused's confession, that no other consideration was to be attached to it, and that the court was not to give it any weight whatever on the ultimate issue of accused's guilt or innocence. He also advised that as a matter of law the accused's actions in producing his belongings as directed without an Article 31 warning amounted to an incriminating statement which was rendered inadmissible

182

in evidence and, likewise, so was the physical evidence discovered during the search. As the law officer summed it up, to quote his language, "Therefore it is my ruling that the entire search proceeding became unlawful." However, he submitted for the court members' determination whether the confession was the product of an unlawful search and seizure or prior incriminating statement, informing them that the confession should be deemed not to have so resulted if the investigators would have discovered the actual evidence of accused's guilt without his assistance.

The board of review held that the law officer erred in allowing accused's confession in evidence. To recapitulate the board's reasoning briefly, it accepted the law officer's conclusion that the evidence surrounding the search and seizure was inadmissible, since accused was a suspect at the time the Government agents elicited from him what amounted to admissions as to the location and identification of his clothing without proper warning in accordance with Article 31. Thus, the board's opinion continues, the real evidence obtained through the search was tainted, and since the criminal investigator used it as a lever to extract accused's confession from him only a short period later without warning him the illegally obtained evidence could not be used against him, the admission of guilt was involuntary and should not have been admitted by the law officer. And since the evidence of record was legally insufficient without the confession, the board of review ordered the charge and specification dismissed.

The board's decision cannot be permitted to stand. While I do not disagree with the Chief Judge, I believe it preferable to decide this case on the theory used by the law officer. See my concurring opinion in United States v Taylor, 5 USCMA 178, 17 CMR 178. Although the sole question here is whether accused's extrajudicial confession was inadmissible as a matter of law because it was involuntary in that he was without free choice to give or withhold it, we of necessity commence our inquiry with the determination on the search which the law officer made at trial. Manifestly he was wholly mistaken if, as his language indicates, he believed the search was illegal. Unquestionably, this search was lawful for at least two reasons. It was authorized by the Detachment Commander, and there can be no doubt but that probable cause existed. A nighttime barracks theft had been reported from a guarded building at the time those billeted therein arose, and little time had elapsed in which the stolen money could have been carried away. It was, therefore, highly likely that the money was in possession of an occupant of the barracks. Moreover, many of the soldiers in the unit were scheduled to ship out that very afternoon and thus the search could be justified on the additional ground that immediate action was necessary to prevent removal or disposal of the money. United States v Doyle, 1 USCMA 545, 4 CMR 137; United States v Swanson, 3 USCMA 671, 14 CMR 89; Manual for Courts-Martial, United States, 1951, paragraph 152. Clearly, this search was nothing more or less than a familiar "shakedown" inspection, the lawfulness of which has long been recognized. Indeed, the facts here are even stronger than those in United States v Gebhart, 10 USCMA 606, 28 CMR 172, where the Chief Judge observed:

"Applied to the facts of the instant case, these basic concepts support the propriety of the initial search. Armed with authority to conduct searches and confronted with a report that certain personal property had been stolen from an enlisted man's locker, Captain Reilly proceeded to conduct the familiar 'shakedown' inspection of the effects of all personnel assigned to that room. Taking into consideration the freedom of access occupants of military quarters have to all parts thereof, this generalized type of search has long been regarded as reasonable." [10 USCMA at page 610.]

True it is that the searchers got no further than accused. However, it is not surprising that they started with him for the evidence pointed in his direction and to two others in the barracks whose wallets had previously been found to contain more than the amount stolen. And it should be remembered that the commander had ordered, and the investigating party indeed was required, thoroughly to search the entire barracks. But when the currency was found, obviously there was no need to continue further.

It is apparent, therefore, that the board of review improperly accepted the law officer's determination that the search was illegal. The next question, then, concerns the accused's alleged self-incriminating activity in complying with the directions by the searching party to produce his gear for inspection. Appellate Government counsel urge that the directions were but an integral part of the search and were only preliminary to the real identification which would have been apparent to anyone who observed the bag. And indeed, such an argument is persuasive when, as here, the Government agents clearly would have obtained the same results forcibly because of the order previously given by the commanding officer, and without according accused polite treatment and directing his assistance. See United States v Cuthbert, 11 USCMA 272, 29 CMR 88. The directions of the investigators were no more than saying "bring your duffel bag or we will come and get it."

The answer to that contention, however, is of no consequence, for assuming that accused's compliance with the order to get his equipment constituted a forced nonverbal statement, it makes no difference. The defense argues that under our decisions in United Startes v Taylor, supra, and United States v Holmes, 6 USCMA 151, 19 CMR 277, articles seized in an otherwise legal search are rendered inadmissible when an unwarned identification by a suspect connects him with the incriminating real evidence. But no such evidence was used against ac-

cused, and in that connection our unanimous decision in United States v Bennett, 7 USCMA 97, 21 CMR 223, must be considered. In that instance, after learning that the investigators had obtained authority to search, accused furnished them a key to his locker. He was then taken to his billet where they had him identify his locker and certain of his clothing—all before proper warning in accordance with Article 31. We noted in our decision that the accused's acts amounted to a statement and adverted to our holding in *Taylor,* supra, but went on to say:

"At the time when the agents undertook to make a search in this case, they had obtained authorization for that course of action and were accompanied by the unit commander. Thus, the search itself was reasonable and lawful, unless the questions asked in one way or another rendered it illegal. We are sure they did not, for the billet of the accused was known; the charge of quarters was present and he was familiar with the locker assignment; accused's locker had his name across the door; the agents had noticed that identifying feature on their first visit; and access to its interior was made easy by the use of a key voluntarily furnished by accused. The articles of clothing, with the possible exception of a pair of boots about which the accused was interrogated, were all found within the locker and it was secured by a lock. We, therefore, reach the conclusion that the Government obtained possession of the property lawfully. When consideration is given to the foregoing, it becomes apparent that the questions asked were innocuous, the answers cumulative, and the information obtained corroborative of facts well known to the parties conducting the search. Under such circumstances, it can fairly be said that the interrogation furnished the agents no advantage which could be later exploited to wring a confession out of the accused. Accordingly, we are faced with a situation where the

Government obtained real evidence by a lawful search and seizure, and the questions asked were merely vocal aids to that legal process. Viewed in their true light, they were preliminary inquiries and added nothing to the knowledge of the investigator." [7 USCMA at page 100.]

That same conclusion is required by the facts in the case at bar. Here a search of all those billeted in the barracks and their equipment had been properly authorized, and accused was so apprised. Also, those conducting the search were armed with a roster listing accused's bunk and locker assignment, so refusal to produce would have availed him naught and, in fact, would but have served to arouse the investigators' suspicions further. In addition, accused's duffel bad was clearly marked with his name, as was the jacket in which the money was hidden. Some suggestion is advanced, however, that accused might not have been using the space detailed to him, and it is pointed out that other casuals housed in the building were preparing to ship out and their baggage was lying in various places in the barracks. The short answer to those arguments, though, is that the searchers were embarked on a "shakedown" inspection of the entire barracks, and had they started with other members of the detachment, by a process of elimination they necessarily would have identified the accused's duffel bag from those of other soldiers. Or had it been left in a locker other than his own, a complete inspection of all lockers would have disclosed it. And once found—as it was certain to have been—accused's bag itself, being marked, provided the searching party with all the information necessary. Clearly then, as in the Bennett case, the directives given accused, when viewed in their proper light, were but preliminary aids to a wholly legal process, and beyond peradventure they provided no additional knowledge to the investigators.

That brings us to our final inquiry. Although the law officer concluded the whole search process was illegal, it is to be borne in mind that ▮▮▮▮▮▮ ▮ that evidence was not introduced against accused. Rather, as in United States v Bennett, supra, "the prosecution scrupulously refrained from using any evidence that was obtained prior to warning," and it came before the court-martial solely because it was elicited by defense counsel on the interlocutory question of the admissibility of accused's confession, and its voluntariness. And while the law officer advised that the search process was improper, he admitted the confession. From what has been said before, it is manifest that he did not err in allowing it in evidence. Indeed, it is again profitable to advert to our decision in Bennett, supra, where we said:

"The relative insignificance of the questioning shown in this record does not render the questioned interrogation legal, but it does shed light on the issue of what led this accused to make a later detailed pretrial statement. No question of force, physical violence, coercion, compulsion or inducement is involved, and whatever information the Government illegally obtained at the time of the search was chargeable only to the failure to warn. It touched only on the identity of the locker and accused clothing, and he was apprised of the fact that his locker was to be opened and his clothing was to be seized. He had voluntarily furnished a key after overhearing a conversation in which the agents were authorized to use the force necessary to search and seize. It was then that he capitulated, and thereafter he undoubtedly cooperated in localizing the search to his particular effects. Therefore, we believe a reasonable person could properly believe that the answers he gave to the agents during the search were such an insignificant part of the seizure that they played no part, either psychological or otherwise, in influencing the accused later to bare his breast and confess his crime. If finding the

185

clothes can be said to have played any part in inducing the confession, the concomitant tainted admissions which accused seeks to build into an important factor were of no consequence in this drama, for the evidence obtained was not needed to relate the accused to the clothing which was seized. We, therefore, hold that the law officer could reasonably conclude that accused's later pretrial statement, if induced by anything other than a desire to unburden himself, was called forth by the results of the prior legal seizure, rather than by accused's minor admissions made contemporaneously therewith." [7 USCMA at pages 100 and 101.]

See also United States v Green, 7 USCMA 539, 23 CMR 3.

Significantly, the accused does not complain that he was impelled to confess because he was ordered to produce the bag. His testimony is that he was motivated to admit his guilt because the money was found in his jacket. That latter circumstance indeed connected him with the theft, but in this setting accused's verbal act, while it ended the search earlier, did not furnish the Government one iota of evidence which, in the course of the inspection, would not have been obtained legally and properly. To suppose that such a neutral statement would influence a subsequent confession when there have been at least two intervening warnings in compliance with Article 31 is placing a premium on credulity.

Accordingly, assuming without accepting the view that the accused's compliance with the investigators' orders to get his equipment constituted incriminating actions which were the equivalent of statements and inadmissible under Article 31 of the Code, the law officer did not abuse his discretion in admitting accused's confession. And after having allowed that extrajudicial statement in evidence, the law officer correctly charged the court members on the question thereby placed before them for their consideration—that of voluntariness. In this connection, they were carefully advised that unless convinced beyond reasonable doubt that the confession was not the product of an unlawful search and seizure or prior incriminating statement, they must reject it as involuntary, but if they were convinced that accused's acts during the search were merely cumulative or corroborative of facts otherwise known or which would have become known without any act on the part of the accused, they could consider the confession and, if otherwise convinced of its voluntariness, attach to it such weight as they deemed appropriate.

The law officer's instructions to the court-martial were long and complex, but under his favorable charge for the accused on the legality of the search, the theory of the defense, the posture of the evidence and the questions posed by the court concerning his charge, that was perhaps unavoidable. However, when narrowed down to its essentials, the advice made the court members fully aware of the limited consideration attaching to the evidence adduced on the interlocutory question and of the proper touchstone for their use in determining the issue of voluntariness. Hence, the questioned confession was properly admitted into evidence and submitted to the court-martial under instructions favorable to the accused.

The certified issue is answered in the negative and the decision of the board of review is reversed. The record is returned to The Judge Advocate General of the Army for further action not inconsistent with this opinion.

QUINN, Chief Judge (concurring):

The admissibility of evidence obtained from a search depends upon what was actually done, not upon what could have been done. Cf. United States v Taylor, 5 USCMA 178, 17 CMR 178. Consequently, I have strong reservations about some intimations in the principal opinion that what the agents could have done is material to the validity of the search.

The critical question before us is whether under the circumstances of

this case, the accused's assumption of a position alongside a bunk and the presentation of a duffel bag for inspection, constitute identification of his effects within the meaning of Article 31, Uniform Code of Military Justice, 10 USC § 831. See United States v Taylor, supra; United States v Bennett, 7 USCMA 97, 21 CMR 223. Two principles provide the framework for consideration of that issue. First, an accused need not be warned of his rights under Article 31 as a condition precedent to a lawful search. United States v Insani, 10 USCMA 519, 28 CMR 85. Secondly, a "shakedown" search of this kind is lawful. United States v Gebhart, 10 USCMA 606, 28 CMR 172. In that kind of search, generally, every person assigned to the room or barracks to be searched is directed to place his effects on his bunk and to stand alongside, or to open his locker and stand by it. In my opinion, compliance with these directions is not an act or statement "regarding the offense" which requires that the accused first be warned of his rights under Article 31 to make admissible evidence of the result of the search. United States v Taylor, supra. The direction and the act of compliance are necessary incidents of a shakedown inspection. I referred to these matters in my opinion in United States v Gebhart, supra. There, as here, the accused and other occupants of the room to be searched were ordered to stand by their respective bunks for a search of the bunks, lockers, and personal effects. Commenting on the propriety of this type of search, I said:

"Applied to the facts of the instant case, these basic concepts support the propriety of the initial search. Armed with authority to conduct searches and confronted with a report that certain personal property had been stolen from an enlisted man's locker, Captain Reilly proceeded to conduct the familiar 'shakedown' inspection of the effects of all personnel assigned to that room. Taking into consideration the freedom of access occupants of military quarters have to all parts thereof, this generalized type of search has long been regarded as reasonable. United States v Swanson, 3 USCMA 671, 14 CMR 89."

The shakedown type of search is "generalized," and a person's action in standing by his bunk and personal effects is not a specific admission that particular articles belong to him. The general nature of this search distinguishes it from the specific type of search in which the chase of the accused is " 'too hot; . . . the scent, too fresh' " to say reasonably that the accused's identification of his effects is not a statement in regard to the offense under investigation. United States v Taylor, 5 USCMA 178, 17 CMR 178, 182 and concurring opinion by Judge Latimer, page 184; United States v Holmes, 6 USCMA 151, 19 CMR 277. I agree, therefore, with the conclusion that the instant search and discovery of the stolen money was legal and did not require that the accused be first advised of his rights under Article 31. As a result, nothing that took place during the search could possibly taint the accused's subsequent confession.

I would answer the certified question in the negative, and I join in returning the record of trial to the board of review for further proceedings.

FERGUSON, Judge (dissenting) :

I dissent.

There are many areas discussed in the principal opinion with which I must express my disagreement. Indeed, the broad approach to the narrow issue before us seems to contravene almost every principle which we have heretofore announced with respect to search and seizure, self-incrimination, and the effect of a law officer's ruling. A recounting of the evidence in the record will illustrate my meaning.

Accused was found guilty of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was sentenced to confinement at hard labor for twelve months, reduction to the grade of recruit, and forfeiture of all pay and allowances. The convening authority reduced the forfeitures

187

but otherwise approved the sentence. The board of review set aside the findings of guilty and ordered the charge dismissed on the ground that the accused's confession was the product of a search and seizure ruled illegal by the law officer. Thereafter, The Judge Advocate General of the Army certified the following question to this Court:

"WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE LAW OFFICER ERRED IN ADMITTING THE CONFESSION INTO EVIDENCE?"

At the trial, the prosecution introduced evidence which tended to establish that accused and one Goodson occupied the same barracks in a replacement detachment. On the evening in question, Goodson placed his wallet, containing $31.00, in his pillow slip and went to bed. On the following morning, he arose and discovered his empty wallet on the floor. He immediately had the barracks secured and reported the theft to the Charge of Quarters. A general examination of the wallets of all occupants of the barracks was authorized by the duty officer. Nothing incriminating was found, other than the fact that two soldiers possessed sums of money in excess of that stolen. The men were permitted to leave the barracks, and the Criminal Investigation Detachment was notified. Agent Matthews was sent to the scene. By this time, the detachment commandant had been notified of the theft and the negative result of the earlier search. He directed that another, more thorough examination be made of the effects of all personnel in the barracks. This order was, in part, based on the fact that the men were to be reassigned to other units on that day.

Agent Matthews was informed by Sergeant Esquivel and Sergeant Hawkins, two of accused's superiors, that he had been seen with the victim's pillow on the preceding evening. All testified that they considered accused to be a suspect and decided to commence the search with an examination of his effects. Thereafter, without any warning under Code, supra, Article 31, 10 USC § 831, Matthews interrogated accused concerning the pillow incident of the previous night. He was also asked

**188**

the location of his bunk and "went and showed 'em my bed." He was then questioned concerning the whereabouts of his "equipment and stuff." Accused replied that it was in his locker, situated at the end of the barracks. He was told to "drag it out." This information was elicited from the accused, as neither Matthews, Hawkins, nor Esquivel were aware of the location of the property to be searched. Although Sergeant Hawkins had in his possession a personnel roster which listed bed and locker assignments, he could not positively state that it included such information with respect to the accused. However, the roster "normally" would have shown his locker and bed number. In any event, the anticipated reassignment of personnel had caused many persons to remove and pack their gear. Hence, interrogation of the accused was necessary in order to discover the location of his property. Thus, Sergeant Hawkins testified as follows:

"Q. I say that you, Sergeant, the sole purpose in your asking the man where his bunk was, was because you didn't know where he was sleeping, is that right?

"A. Right, sir.

"Q. And you wanted to know?

"A. Right, sir.

"Q. Now, you did not know where his equipment was being kept, did you?

"A. That's right, sir.

"Q. So you asked him so you could go get it, is that not correct?

"A. That's right, sir.

"Q. Because you all wanted to search it?

"A. Right, sir."

Having secured accused's equipment and baggage, Hawkins proceeded to search it. An examination of a fatigue jacket taken from accused's duffel bag disclosed the presence of currency in the exact amount and denominations stolen. Accused was then advised of his rights under Code, supra, Article 31, and taken to the Military Police Station. This occurred at approximately 9:30 a.m. Following lunch, he was again advised of his rights and in-

terrogated by Agent Matthews. During the questioning, reference was made to the discovery of the money in his fatigue jacket and the jacket itself was displayed. Accused confessed, according to his testimony, only because the money had been discovered in his jacket.

It should be borne in mind that the defense produced the foregoing evidence relating to the search and its result. After establishing a *corpus delicti* with the victim's testimony, the prosecution sought only to introduce accused's confession in evidence. Defense counsel objected on the basis of the unwarned interrogation of the accused which resulted in the identification of the property to be searched. In support of his contention that the subsequent confession was the product of this earlier, unwarned interview, he established the circumstances surrounding the discovery of the money and accused's detention.

Ultimately, the law officer held that the search was unlawfully conducted and that its products were inadmissible. In view of the references in the principal opinion to its legality, premised upon probable cause and authorization by the commanding officer, I deem it necessary to advert to the exact wording of his ruling, which will demonstrate beyond peradventure that the trial judge was concerned with the accused's unwarned interrogation rather than the quite different proposition of authority to conduct the quest. Thus, he stated to the court members:

". . . In this case, you have heard evidence to the effect that the person or persons conducting the search, without warning the accused of his rights under Article 31, directed the accused to produce his belongings and lay them out for inspection. The accused complied and a search of his belongings produced certain physical evidence which tended to connect the accused with the offense charged. *The acts of the accused at this time amounted to an incriminating statement within the purview of Article 31 and are rendered inadmissible in evidence because of the failure to warn the accused of his rights under Article 31 prior thereto. The physical evidence discovered during the search is likewise rendered inadmissible. Therefore, it is my ruling that the entire search proceeding became unlawful at that point and thus you are precluded from considering any and all of this search evidence, to include the accused's acts and the physical evidence which was discovered, during your deliberations on the merits of the case, that is, your deliberations on the guilt or innocence of the accused."* [Emphasis supplied.]

From the foregoing recital of the evidence and the ruling of the law officer, it appears that the issue which he decided, and which eventually led to the board of review's reversing action, was simply whether the unwarned interrogation of the accused concerning the identification of his property rendered the subsequent search unlawful. As pointed out in the principal opinion, our decisions in United States v Taylor, 5 USCMA 178, 17 CMR 178, and United States v Holmes, 6 USCMA 151, 19 CMR 277, hold without qualification that an otherwise lawful search is rendered illegal and its products made inadmissible when an unwarned identification by a suspect connects him with incriminating real evidence. Thus, in the *Taylor* case, we reversed because the accused "was asked [without warning] to point out the clothing items which were his property." United States v Taylor, supra, at page 180. In United States v Holmes, supra, the same action was ordered for the erroneous receipt in evidence of certain clothing worn by the accused. The items had been obtained by investigators who, without giving the required advice, asked the accused "to accompany them to his bunk [and] . . . 'to show . . . the clothes that he had worn that evening.'" United States v Holmes, supra, at page 154. Finally, in United States v Williams, 10 USCMA 578, 28 CMR 144, we similarly ordered a rehearing when agents, without warning, learned from the accused the location of certain clothing which he had worn on the night of his offense.

189

The cited cases make it clear beyond cavil that the law officer applied proper legal principles in making his ruling favorably to the accused. Indeed, they are the very authorities which were called to his attention by counsel. My brothers, however, overturn the trial ruling by seeking first to treat it as a simple issue of search and seizure and, secondly, to consider the question of self-incrimination as if it were identical to that before us in United States v Bennett, 7 USCMA 97, 21 CMR 223.

I have already suggested that the first approach is absolutely at variance with the rationale behind the law officer's ruling. Concededly, the search itself was authorized by a commanding officer who undoubtedly had probable cause to suspect the accused.[1] Thus, it was legally commenced. This, however, is totally irrelevant to our resolution of the issue before us, for, as counsel argued and as the law officer pointed out, the actual quest became unlawful only because of the later, unwarned interrogation of the accused. United States v Taylor, United States v Holmes, United States v Williams, all supra. Thus, the real key to the accuracy of the board of review's opinion is not the authorization for the search, but whether, as a matter of law, it can be stated that there was no evidence in the record to support the law officer's ruling.

It is the law officer's task initially to rule on the admissibility of evidence, United States v Stewart, 1 USCMA 648, 5 CMR 76, and we are bound to respect his decision unless "it is incorrect as a matter of law." United States v Brown, 10 USCMA 482, 486, 28 CMR 48; United States v DeLeon, 5 USCMA 747, 19 CMR 43. Thus, in United States v Berry, 6 USCMA 609, 20 CMR 325, we pointed out that it was the law officer, rather than the members of the court-martial, who must resolve the disputed questions of fact, apply the law, and rule finally with respect to a question of the legality of a search. Turn-

ing to the record before us, I assert that he did just that, and fairly resolved the matter in favor of the accused.

Initially, it must be noted that there is no conflict in the evidence concerning whether accused, although suspected of larceny, was not warned prior to being interrogated by Matthews, Esquivel, and Hawkins. It is equally clear that none of these men, particularly in view of the impending departure of all the transients involved, knew the location of accused's locker, duffel bag, or bunk. They admittedly obtained this information from the accused. Perhaps they could have obtained the same result by reference to Hawkins' roster or by questioning other soldiers. The point is that they did not do so, and the evidence is more than sufficient to support the ruling of the law officer that they chose the forbidden course of discovering this essential fact by unadvised questioning of a suspect. Moreover, I suggest that the consideration of what these investigators "could have" done is wholly immaterial. Suppose, for example, we were confronted with a record in which a military detective did not advise an accused of his rights under Code, supra, Article 31, before obtaining a confession, but the testimony also established that he "could have" warned the accused if he had desired to do so, or that the confession meant little to him for he "could have" solved the crime without it. Can it be seriously suggested that we would affirm merely because he might have chosen these alternative courses of action when he, in fact, did not? The answer is not only obvious, but we made it patently clear when the late Judge Brosman and the Chief Judge rejected the same contention in United States v Taylor, supra, at page 182:

". . . To say that this places an insupportable burden on the investigative and enforcement agencies of military law is to talk nonsense. Thus, in the case before us now, the

---

[1] I note some intimation in the principal opinion that such a search need not be based upon probable cause. As I am convinced that the authority to conduct the search was never in issue

at the trial, I am satisfied merely to call my brothers' attention to United States v Brown, 10 USCMA 482, 28 CMR 48, and our contrary holding therein.

investigators concerned would have lost nothing by pausing to inform the accused of his rights under Article 31, and of the offense of which he was suspected. *Thereafter, if he declined to identify his clothing, they could (a) have sought identification from other occupants of the hut; or (b) looked for identification marks on the garments which would reveal their ownership. In any event, although a heavier burden had been placed by Congress on military investigators than is visible here, this Court—like the several Armed Forces—would nonetheless be bound by that mandate."* [Emphasis supplied.]

The other prop used to overturn the board of review's decision is a comparison of this case with United States v Bennett, supra. Thus, it is said that, in view of our decision in that case, the board of review was wrong to reverse here, "assuming that accused's compliance with the order to get his equipment constituted a forced nonverbal statement." Again, I believe that the author of the principal opinion errs in his construction of our holding there.

In *Bennett,* supra, agents requested a suspected accused to identify his locker and certain articles of clothing found therein without the required warning under Article 31. There, as here, the Government made no offer in evidence of the items it thereby obtained, and the issue before us was, as here, simply whether the evidence thus obtained was used to extort a confession from the accused. However, we pointed out quickly that the property in question there had been *lawfully obtained by the Government,* as the accused's locker assignment was known to the agents without regard to the interrogation. Indeed, the locker itself bore accused's name, an identifying feature which they had noted before questioning him. Of that controlling factor, we said, at page 100:

". . . When consideration is given to the foregoing, it becomes apparent that the questions asked were innocuous, the answers cumulative, and the information obtained corroborative of facts well known to the parties conducting the search."

An examination of this record, however, discloses that only the questions resulted in identification of accused's clothing; that the answers thereto furnished the sole disclosures regarding its location; and that they were the single source of the agent's information. Accordingly, it does not appear to me that United States v Bennett, supra, presenting the very antithesis of the situation here depicted, can serve as a basis for overturning the board of review.

In sum, it is my view that the evidence of the circumstances surrounding the search raised an issue concerning its lawfulness in light of the unwarned obtaining of information regarding the accused's bed, locker, and property. It may be that the law officer could have concluded that no impropriety was present. See United States v Cuthbert, 11 USCMA 272, 29 CMR 88, and United States v Insani, 10 USCMA 519, 28 CMR 85. In both of these cases, however, we noted the failure of accused to raise any issue regarding the identification of his locker. As noted above, the point is that the law officer chose to rule against the Government and that the record offers a substantial basis for his decision. Accordingly, we must accept it. United States v Brown, supra; United States v Berry, supra.

Having concluded that the law officer's ruling was correct, there can be little argument concerning the propriety of the board of review's action. As we pointed out in United States v Bennett, supra, at page 101:

". . . [W]e now announce the rule that if the Government obtains admissions illegally, and they are of a nature likely to produce a subsequent confession, a strong showing that a subsequent warning severed the presumptive influence must be made to permit use of the confession. *Furthermore, absent any showing that the accused knew or had been informed that his prior admissions could not be used against him, the fact that he was advised of his rights prior to the execution of his confession would normally not avoid the*

**191**

*Taylor result.*" [Emphasis supplied.]

In the instant case, not only was the accused not advised of the inadmissibility of the stolen money discovered upon him but the fact that it was so found was used as a tool of interrogation. Thus, it is clear beyond cavil that the board operated well within proper bounds in determining that the confession was inadmissible. See United States v Alaniz, 9 USCMA 533, 26 CMR 313. Accordingly, I am of the view that the certified question must be answered in the affirmative.

Although it was not included within the certified issue, the fact that the principal opinion also treats of the sufficiency of the law officer's instructions regarding whether accused's confession was a product of the prior unlawful search necessitates a brief expression of my views thereon. In this respect, I need go no further than to state that the advice repeatedly informed the court-martial that the confession might be considered if Matthews, Esquivel, and Hawkins "could have" utilized means other than unwarned interrogation of the accused to identify his propery, although they did not, in fact, do so. As I have stated above, what "could have" been done is meaningless in the resolution of this question. Accordingly, to advise the members of the court that it had controlling significance was prejudicially erroneous. It has been said that the saddest words in the English language are "What might have been." The truth of that aphorism will be truly demonstrated if possible alternative courses of action are to govern the development of the law of self-incrimination.

I would answer the certified question in the affirmative and affirm the decision of the board of review.