UNITED STATES, Appellee

v

RALPH L. ROSS, Postal Clerk Chief,
U. S. Navy, Appellant

13 USCMA 432, 32 CMR 432

*Fred W. Shields, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Olin W. Jones,* USMC, and *Lieutenant Colonel M. G. Truesdale,* USMC.

*Major Elvin R. Coon, Jr.,* USMC, argued the cause for Appellee, United States.

## Opinion of the Court

QUINN, Chief Judge:

Contending that certain evidence, admitted over his objection, was obtained as a result of an illegal search and seizure, the accused asks for reversal of his conviction for several offenses, including unlawful sale of advance copies of Navy promotion examinations, in violation of the Uniform Code of Military Justice.

The accused, who was in charge of the Post Office on the U. S. S. KEARSARGE, and an accomplice, offered to sell to Shipfitter First Class Daniel Cronin a copy of a scheduled service-wide promotion examination. After some preliminary talks with the accused, Cronin was apprehended by agents of the Office of Naval Intelligence. At their request, Cronin agreed to buy a copy of the examination from the accused. He arranged to meet the accused at the latter's apartment in the city of San Diego. The accused and his family occupied an apartment on the second floor of a building. Access to the apartment was by way of an outside stairway, with a porch at the head of the staircase. The first room entered from the porch was the kitchen; beyond that was the living room and dining area. The remainder of the apartment consisted of two bedrooms and a bathroom.

Accompanied by Lieutenant Hartman, an agent of the Office of Naval Intelligence, Cronin arrived at the accused's apartment about 6:30 or 7:00 p. m. They were greeted by the accused and invited into the living room. The accused's wife was also present. Hartman was introduced as a shipfitter. After some conversation, Cronin asked for the examination for shipfitter and the one for torpedoman. The accused left the living room for a few minutes; when he returned he had with him what appeared to be a reproduction of the examination for each of the requested rates. Cronin paid the accused $500.00 for the examinations. The accused told them to remove the covers because they were useless. The accused's wife said, "tear it off and we will burn it here." Her suggestion was ignored. After some further conversation, Hartman and Cronin indicated they had to leave. The accused went with them to the front door. All three went out on the porch. At that point, Hartman announced he was a "Federal agent" and that the accused was " 'under arrest' "; he also warned the accused that anything he said could be used against him. Several other agents that had been stationed around the area came up the stairs to the porch. The accused was searched.

After search of the accused's person, the agents and the accused went into the house. The accused was informed he was suspected of "theft, compromising, [and] illegal handling of service-wide examinations," and advised he did not have to make any statement, and if he said anything it could be used against him in a trial by court-martial. He was also told by the agents that they "understood" there were examinations in the residence; and while they had a legal right to search the property "incident to his arrest," they would "prefer" his cooperation in obtaining the examinations. The accused took them into one of the bedrooms. Picking up a stack of papers from the headboard of

the bed, he said: "'These are them.'" He placed them on the bed.

Three rooms were searched, the kitchen, the dining room and one of the bedrooms. From them "items pertinent to the service-wide examinations" were taken. A bedroom, into which the accused's children were shepherded during the search, was not examined; nor was the living room searched. A photocopying machine was taken from a corner of the kitchen. Reproduced copies of service-wide examination papers were taken from the bed on which the accused had placed them. Sixteen wrist watches were found in a closet in that bedroom; these became the subject of a charge of larceny (Charge III). Some items of evidence were obtained from a search of the accused's pockets. A bank book and some bank statements were obtained from Mrs. Ross; these were later returned to her.

The Fourth Amendment to the United States Constitution protects all persons from "unreasonable searches and seizures." In applying the protection of the Amendment to specific situations involving persons subject to military law, military courts have been guided by the decisions of the Federal civilian courts. See United States v DeLeo, 5 USCMA 148, 17 CMR 148; United States v Doyle, 1 USCMA 545, 4 CMR 137. See also United States v Jacoby, 11 USCMA 428, 29 CMR 244.

It is well settled that a valid search may be made incident to a legal arrest. United States v Rabinowitz, 339 US 56, 60, 94 L ed 653, 70 S Ct 430; United States v Ball, 8 USCMA 25, 23 CMR 249. Appellant acknowledges the principle, but disputes its applicability to this case. His argument takes two forms. First, he challenges the authority of Lieutenant Hartman to effect his arrest or apprehension; secondly, he denies the reasonableness of the ensuing search.

Article 7, Uniform Code of Military Justice, 10 USC § 807, provides for the apprehension of persons subject to military law.[1] Authority to apprehend is conferred upon persons "authorized under regulations governing the armed forces." The Manual for Courts-Martial, United States, 1951, implements this general grant of Congressional authorization. In pertinent part it provides as follows:

"**Who may apprehend.**—All officers, warrant officers, petty officers, noncommissioned officers, and, when in the execution of their guard or police duties, air police, military police, members of the shore patrol, and such persons as are designated by proper authority to perform guard or police duties, are authorized to apprehend, if necessary, persons subject to the code or subject to trial thereunder upon reasonable belief that an offense has been committed and that the person apprehended committed it. See Article 7b." [Manual for Courts-Martial, United States, 1951, paragraph 19a.]

The accused does not deny Lieutenant Hartman's status as a commissioned officer of the United States Navy; nor does he deny that in effecting the arrest or apprehension the Lieutenant was carrying out "police duties" as an agent of the Office of Naval Intelligence. See Secretary of the Navy Instruction 5430.13A, August 10, 1954; Manual of the Judge Advocate General, United States Navy, § 0213; United States v Ball, supra. An ap-

---

[1] The Uniform Code of Military Justice refers to taking a person into custody as an "apprehension." It uses the word "arrest" to describe a less severe form of restraint than confinement. See Articles 7 and 9, 10 USC §§ 807, 809. However, in common usage and understanding, an "arrest" is the taking of the person into custody; it is often used "interchangeably" with apprehension. Webster's New International Dictionary, 2d ed, page 153. See also United States v Scott, 149 F Supp 837, 840 (DC DC) (1957). In the principal opinion in United States v Dutcher, 7 USCMA 439, 442, 22 CMR 229, Judge Latimer pointed out that the Uniform Code changed the earlier terminology of taking a person into custody from "arrest" to "apprehension."

prehension effected in either capacity is authorized.[2] We conclude, therefore, that the record of trial overwhelmingly establishes the legality of accused's apprehension or, as used here, "arrest."

Part of the second ground of the accused's attack on the validity of the search can immediately be ▪ put aside. He would have this Court reconsider and disapprove the rule that a search incident to an arrest can extend beyond the person of the one arrested to include "the place where the arrest is made." Agnello v United States, 269 US 20, 30, 70 L ed 145, 46 S Ct 4. The rule has been iterated and reiterated by the United States Supreme Court. United States v Rabinowitz, supra; Harris v United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098. And it has been followed consistently by the Federal courts and by this Court. See Minovitz v United States, 298 F2d 682 (CA DC Cir) (1962); United States v Ball, supra; United States v DeLeo, supra. We have no doubt of the validity of the rule, as the Fourth Amendment has been construed, and we have no disposition to disregard this settled construction. We turn, therefore, to the problem of the "place" where the arrest was made.

It will be recalled that Lieutenant Hartman arrested the accused on the porch *outside* the apartment. ▪ The question then is whether an arrest on the outside of a dwelling justifies a search of the dwelling. In considering this question, the board of review concluded that the porch was "an integral part" of the accused's apartment, and that apprehension in that part justified a search of the remainder of the premises. In our opinion, this conclusion is supported by reason and judicial precedent.

In Page v United States, 282 F2d 807, 813 (CA 8th Cir) (1960), the defendant sold narcotics to police informants. The sale was made in his home. Early the next morning he was observed leaving the porch of his house and walking across the sidewalk to a taxi. A narcotics agent approached and identified himself. The accused ran toward the house. He was followed by the agent, who caught him on the steps leading to the porch. As the accused was informed he was under arrest, he dropped a small container of heroin to the ground. After the accused's person was searched at the place of his arrest, the agents searched his house. The Court of Appeals held that the search of the house "was unreasonable as being beyond the bounds of what properly might be considered as incidental to the defendant's arrest outside the dwelling." *Page,* however, is materially different from this case in that here the offense for which the accused was arrested was committed in the house immediately before the agent and the accused stepped out on the porch. The accused and the agent were never separated, as in *Page,* from the situs of the offense for which the arrest was made. This difference requires a different result.

Clifton v United States, 224 F2d 329 (CA 4th Cir) (1955), cert den 350 US 894, 100 L ed 786, 76 S Ct 152, sets out the rule applicable to the situation present here. In *Clifton,* United States Alcohol and Tobacco Tax Division investigators and an informer went to the defendant's house to buy untaxed whisky. On inquiry, they were informed by an occupant of the house to see Padgett, who lived down the road. The agents went to Padgett as directed. After informing him of their purpose, they returned to the defendant's house, accompanied by Padgett. Padgett en-

---

[2] Of course, probable cause for the apprehension must also be present. Article 7, Uniform Code of ▪ Military Justice, 10 USC § 807; United States v Ness, 13 USCMA 18, 32 CMR 18. The accused does not contest, and indeed the record of trial compellingly shows, the existence of probable cause. In view of Lieutenant Hartman's specific authority to apprehend, it is unnecessary to consider, as it applies to the military, the general rule that a citizen has authority to apprehend a person for a felony committed in his presence. See 4 Wharton, Criminal Law and Procedure, § 1602 (1957); cf. United States v Garner, 7 USCMA 578, 23 CMR 42.

tered the house through the back door, while the agents waited in the yard. After a while, Padgett emerged, carrying a half gallon of untaxed whisky. The agents paid him for the whisky, and then told him he was under arrest. They entered and searched the house. In sustaining the search as an incident to Padgett's arrest, the Court of Appeals said:

"The investigators had just purchased untaxed whisky from Padgett after watching him obtain it from the room which they later searched. The search did not extend beyond the *room from which the whisky had come*, and no force was used. Under these circumstances, we feel that the search was reasonable." [Clifton v United States, supra, page 330. See also United States v Jackson, 149 F Supp 937 (DC DC) (1957), reversed on other grounds, 250 F2d 772 (CA DC Cir) (1957).]

In Kremen v United States, 353 US 346, 1 L ed 2d 876, 77 S Ct 828, Federal Bureau of Investigation agents had a warrant for the arrest of Thompson and Steinberg. They located them in a rented, two-story cabin which, at the time, was being shared by Kremen and Coleman. The agents arrested Thompson and Steinberg in the yard of the cabin. They ordered Kremen and Coleman out of the cabin and placed them under arrest for knowingly harboring fugitives from justice. All four persons were searched in the yard, and documents on their persons were seized. Then the agents searched the cabin, and seized and removed all items of personal property not belonging to the owner of the premises for further examination in their offices in San Francisco. The United States Supreme Court held the *seizure* was invalid because "seizure of the entire contents of the house and its removal some two hundred miles away . . . [was] beyond the sanction of any of" the cases considered by the Court. Significantly, the Court did not strike down the search because made at a place other than the place of arrest. Instead, it invalidated the seizure because the removal of the *entire contents* of a house was unreason-

able under the circumstances of the case. *Kremen,* therefore, supports the *Clifton* holding that a dwelling in which the crime is known to have been committed is not a privileged sanctuary, when the criminal is apprehended on the outside of the dwelling immediately after the commission of the offense. See also United States v Gebhart, 10 USCMA 606, 610, 28 CMR 172. Reasonableness of search is especially apparent when it is known, as it was here, that someone inside the dwelling is a party to the offense, and has proposed destruction of some of the instrumentalities of the crime. We hold, therefore, that it was reasonable to search the accused's apartment incident to his apprehension on the porch.

Our conclusion as to the reasonableness of instituting a search of the apartment leaves unanswered the related question of the reasonableness of the extent of the search. The accused contends the search was an impermissible, general exploratory search, for whatever incriminating evidence might be uncovered. In Harris v United States, supra, the Supreme Court sustained, as incident to an arrest, the thorough search of a four-room apartment. The record of trial here shows that the search was much more limited than that in *Harris.* The bedroom in which the accused's children were sheltered was not searched. Neither was the living room searched; and Mrs. Ross testified that the agents only "looked around" the kitchen in which the photocopying machine was open to view. Moreover, the accused was informed by the agents that they were "looking for the exams." It manifestly appears, therefore, that "specificity was the mark of the search and seizure." Rabinowitz v United States, supra, page 62. True, in the course of the search, the agents discovered and seized sixteen wrist watches. While this evidence was connected with another offense not then pending against the accused, "officers may [during a lawful search] seize items relatively apparent, even though the original purpose of the search did not relate

**437**

to those items." United States v Doyle, 1 USCMA 545, 549, 4 CMR 137. Nor was the search made unreasonable by the request for the bank statements. Assuming they were improperly obtained, the seizure of a few minor items which were not used against the accused, does not so taint the proceedings to make unreasonable an otherwise reasonable search and seizure. See United States v Higgins, 6 USCMA 308, 20 CMR 24. We conclude, therefore, that the search and seizure here did not go beyond the limits imposed by the necessities of the case. Cf. Kremen v United States, supra.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.