[2] Maze v United States Army Court of Military Review, 20 USCMA 599, 44 CMR 29 (1971).

---

UNITED STATES, Appellee

v

DELBERT W. FLEENER, Major, U. S. Air Force, Appellant

21 USCMA 174, 44 CMR 228

No. 24,146

February 18, 1972

*George W. Latimer, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Bertram Jacobson* and *Lieutenant Colonel Norman L. Paul.*

*Captain Bruce D. Viles* argued the cause for Appellee, United States. With him on the brief were *Colonel Henry R. Lockington* and *Colonel James M. Baumgarner.*

## Opinion of the Court

DUNCAN, Judge:

Although several issues were requested to be reviewed, we granted review only on this issue:

The military judge erred in overruling appellant's motion to suppress the evidence seized from the person of the appellant for the reason that the search was in violation of the authority granted to the searching officer.

Major Delbert W. Fleener, a highly experienced and decorated pilot stationed at Tan Son Nhut Air Base, Republic of Vietnam, had duties which required that he frequently fly from his station to various cities in Southeast Asia, including Bangkok and Hong Kong.

On February 20, 1970, the VC-118 aircraft he was flying en route to Bangkok developed engine trouble.

The flight was completed, but the faulty engine had to be replaced; this necessitated Major Fleener's staying in Bangkok until a replacement engine could be delivered to Bangkok and installed.

The accused caused a number of boxes and their contents to be transported from Bangkok to Tan Son Nhut by different aircraft. On February 21, 1970, the accused requested that a Major Wadsworth, the aircraft commander who delivered the replacement engine, take four boxes back to Tan Son Nhut, representing that the boxes contained books for the USO. Major Wadsworth agreed and the boxes were transported to Tan Son Nhut, where Major Davis, a friend of the accused, met the aircraft and took the boxes into his possession.

Major Barzoloski, a co-pilot on another aircraft, arrived in Bangkok on February 22, 1970. After a conversation with Fleener, Barzoloski agreed to take four additional boxes to Tan Son Nhut after having been informed by the accused that the boxes contained brassware for certain personnel of the Civil Aeronautics Advisory Group.

The contents of the four boxes Major Barzoloski agreed to cause to be transported were later discovered not to contain brassware. Major Burnett, the navigator on the plane that Major Barzoloski was to co-pilot back to Tan Son Nhut, shared with the accused a hotel room in Bangkok from February 20 to February 22, 1970. In the room Burnett observed the accused wrapping cord around one of the four boxes on the morning of February 21, 1970.

On February 22, 1970, during the flight to Tan Son Nhut, Burnett had occasion to lift one of the boxes Barzoloski had agreed to take aboard, which were the boxes he had seen in the hotel room the preceding morning. The heavy weight of the boxes surprised him, and after a conversation with the aircraft commander and other crew members one of the boxes was opened. A number of wrapped pack-

176

ages were inside the box, one of which was opened revealing a brown hard plaster-like substance. One of these packages was removed and the box rewrapped. Major Davis met the aircraft, took possession of the boxes, and was later seen to carry the boxes into Fleener's room at the Bachelor Officers' Quarters.

Subsequently, a portion of the plaster-like brick taken by Major Burnett was given to personnel of the Office of Special Investigations. Chemical analysis of a portion of the brick revealed it to contain opium.

On February 23, 1970, Special Agents Welch and Walsh visited Colonel Marek, Commander, 377th Combat Support Group, to inform him of Major Burnett's discovery and to procure authority to conduct a search. The special agents brought with them two writings later admitted into evidence. Appellate Exhibit 3 is entitled AUTHORITY TO SEARCH AND SEIZE and signed by Colonel Frank E. Marek. The importance of this exhibit to our determination is such that the text is set forth in part as follows:

"SPECIAL AGENT DONALD R. WALSH has informed me that he is investigating the offense of illegal possession and trafficking in opium, a narcotic and has requested that I authorize a search of the (person of quarters of Major Delbert W. Fleener,) . . . and the seizure of the following specified property: boxes containing bricks of opium, a narcotic; said boxes are described as being made of cardboard, and as being approximately 20″ x 20″ x 18″ each, each weighing approximately 30 to 40 pounds when loaded; opium of any description; any shipping documents or other correspondence relating to the possession and transfer of such narcotics, and any instruments, tools, or devices such as may relate to the shipment, use, or possession of the above.

"Having carefully considered the matters presented to me in support of that request, I am satisfied that

there is probable cause to believe that the property specified above is being concealed on the (p̶e̶r̶s̶o̶n̶) (premises) described. . . .

. . . . .

"Accordingly, SPECIAL AGENT DONALD R. WALSH, . . . is directed to search forthwith the (p̶e̶r̶s̶o̶n̶) (premises) described for the property specified. . . . This authority to search and seize is issued by virtue of:

"/x/ My position as commander having jurisdiction over the (p̶e̶r̶s̶o̶n̶) (premises) herein described."

Colonel Marek testified concerning the authority given to the special agents to search as follows:

"TC: At the time you signed this document did you intend—let me put it this way: At the time you signed the document, what authority did you intend to give to the OSI in relation to this?

"IDC: That is objected to on the grounds that it is incompetent and immaterial. The document speaks for itself.

"MJ: Overruled.

"WIT: My recollection—and I can't recall that this was stricken.

"TC: You are referring to the word, 'person'?

"A. On this Exhibit number 3, it was my knowledge that when I signed the document that not only could they search the quarters, but they could search the person as well.

"Q. Of Major Fleener?
"A. Yes sir.

"IDC: I move to strike that on the grounds that it is incompetent, immaterial and irrelevant.

"MJ: I am at a disadvantage. I don't know what is in that document. May I see it, please.

"TC: Yes sir. I furnish your honor Appellate Exhibit 3.

"(TC handed Appellate Exhibit 3 to the military judge.)

"MJ: Colonel Marek, did you verbally give authority to these OSI agents to search the person of Major Fleener?

"WIT: The person as well as his quarters. That was my decision.

"MJ: Do you recall whether you in fact gave the OSI agents authority to search the person?

"WIT: Yes, sir, it was my assumption, the person and the quarters.

"IDC: I move to strike that on the grounds that the assumption is incompetent, irrelevant and immaterial.

"MJ: We are not concerned with an assumption, Colonel Marek. What we are trying to determine. . .

"WIT: Then let me finish my answer. On the basis that the person and the quarters would be searched.

"IDC: I move to strike that as being incompetent, irrelevant and immaterial.

"MJ: What I would like you to tell us, as best you can recollect, is what you told the OSI agents. What did you say to them in authorizing a search? Can you recall?

"WIT: No, I don't think I made a statement. I signed it. I do not recall that being stricken as it is. I don't know how they got that way.

"(The military judge returned Appellate Exhibit 3 to TC.)

"MJ: It is your testimony then that you cannot recall whether you told the OSI agents that they should search the person and the premises and the other property belonging to Major Fleener?

"WIT: I did not say anything enlarging other than what was here, except that on the basis that normally when a search is conducted it includes the person and his quarters.

"IDC: I would move to strike part of the answer, which is 'normally.'

"MJ: Motion denied.

"MJ: Colonel Edwards, you may proceed.

"TC: Colonel Marek, do you recall what authority the OSI agents verbally asked you for after giving you this briefing?

"IDC: I have the same objection to that. What they asked for is not necessarily proof of what authority they were given.

"MJ: I will permit the answer.

"TC: Do you recall them briefing you and then asking you for some authority? Do you recall what they asked for, what they were looking for, or areas they wanted to search?

"A. They wanted to search the quarters of Major Davis and Major Fleener.

"Q. Did they discuss the person of either?

"A. To search the person? No, sir, that was not discussed."

Testifying concerning the transaction with Colonel Marek, Special Agent Welch stated on direct examination:

"TC: Don't tell us what you assumed. Tell us what you discussed.

"A. Well, we discussed specifically what was to be looked into within the room, that is, any items or boxes containing narcotics, any documents, checks, shipping documents let us say, cancelled checks or anything that might pertain to money transactions. The search of the two individuals was required.

"IDC: I move to strike that. To say the search of the individuals was required is irrelevant and immaterial.

"MJ: I think you need a clarification. I will overrule it. You may finish the answer.

"A. There was a discussion about the possibility of when having an individual who may be using narcotics, you may find narcotics in the room in such a state that the individual might use it, or the instruments of narcotics, such as needles,

that a search of the individual would be required, if for nothing else, for your own safety.

"IDC: Would you strike that—the last part of the sentence—because it is incompetent and immaterial and calls for a conclusion of the witness. It is irrelevant.

"TC: I certainly think it is relevant what this witness says that the Base Commander was informed on.

"MJ: Using the word, 'required,' Major Welch, this is what? In your mind it is required?

"WIT: Yes, sir.

"MJ: Colonel Edwards, I believe you wanted to ask him a question as to what the Base Commander was informed. Is that correct?

"TC: Yes.

"MJ: You many proceed.

"IDC: May I have a ruling on my objection?

"MJ: Overruled.

"TC: What was the Base Commander informed relative to search of person, if anything?

"A. He was not informed of anything regarding the search of specific items that might be found on the person other than he may have been informed . . .

"IDC: Just a minute. I object to what he may have been informed.

"TC: Just tell us what you remember.

"A. The word, 'person,' was not used as I recall. The two names being searched and the requirement to search was used. As to the specific items on the person, I cannot state at this time that this was gone into.

"Q. Was currency discussed?

"IDC: That is a leading question, I object.

"TC: I don't know how else to do it.

"MJ: Continue.

"TC: Was currency discussed?

"A. As part of the instruments, this was also considered to be monetary, and the possibility was suggested that money would be found. Yes.

"IDC: I move to strike the last answer of the witness because it is incompetent, immaterial and irrelevant. It is speculative and imaginatory and does not state the contents of the conversation that would be important.

"TC: I will concur and withdraw the question. Your witness."

Special Agent Walsh testified on direct examination:

"WIT: I requested authority to search Major Davis and Major Fleener. I told him we were looking for four boxes which Major Davis had placed in Major Fleener's room. I told him that we were interested also in determining if we could the source of the opium and also the delivery, or the person who would pick up the opium. Essentially, that is what I explained to him.

"Q. Did Colonel Marek make any comment to you after you gave him this briefing?
"A. Yes sir. He said something to the effect: 'Go get 'em,' or 'Have at it.' I don't recall the specific words."

Agents of the Office of Special Investigations, at about 1:00 a.m. on February 24, 1970, proceeded to the accused's quarters. Major Fleener was not present when they arrived. Later, at approximately 1:30 a.m. that morning, the agents saw accused in the hallway of the Bachelor Officers' Quarters building where he resided. Special Agent Walsh on direct examination described the next events as follows:

"Q. Would you tell the court exactly, as best you recall, the words that you used in giving Major Fleener this advice.
"A. Yes, sir, I read the advisement from this card. (Witness removed card from his pocket.) I advised him: 'I am Special Agent Donald R. Walsh. I am investigating the alleged offense of illegal possession and traffic[k]ing in narcotics, and specifically opium, of which you are suspected. I advise you that under the provisions of Article 31, UCMJ you have the right to remain silent, that is to say nothing at all. Anything you say may be used as evidence against you in a trial by court-martial or in other judicial or administrative proceedings. I advise you also that you have a right to consult with a lawyer. If you desire to have a lawyer present during this interview, you may obtain a civilian lawyer of your own choosing at your own expense, or, if you wish, the Air Force will appoint a military lawyer for you free of charge. You may request a lawyer at any time during this interview and if you decide to answer questions without a lawyer present, you may stop the questioning at any time.' That is the advisement which I gave Major Fleener that night on the 24th. I asked him if he understood his rights under Article 31, and he answered 'yes.' I asked him if he wanted a lawyer, and he answered, 'no.' As soon as he replied, I said, 'You are sure? You understand your rights?' He said, 'Yes.' I said, 'And you don't want a lawyer?' He said, 'No.'"

Certain papers with writings thereon, $539.00 in American green currency in a wallet, an envelope containing $1,000.00 in American green currency, and another envelope containing $2,000.00 in American green currency then. were removed from the person of the accused by the special agents.

Major Fleener was taken to the Office of Special Investigations district office where again he was advised of his rights as required by Article 31, Uniform Code of Military Justice, 10 USC § 831. He then made both oral and written statements. He told the agents that on the evening of February 23, 1970, he had brought twelve additional boxes from Bangkok which were retrieved from his wall locker.

Individual defense counsel timely raised objections to the introduction into evidence of all items seized both from his premises and his person; however, the items were admitted.

The accused was tried by general court-martial on March 26, April 6, and April 20–26, 1970, at Tan Son Nhut Air Base, Republic of Vietnam. The court-martial was convened by the Commander, Headquarters, Seventh Air Force (PACAF). The accused was charged with, and, contrary to his pleas, was convicted of, wrongfully possessing 559 pounds of opium (1 specification), wrongfully introducing opium into Air Force aircraft for transport (3 specifications), wrongfully introducing opium into a military installation (3 specifications), violating a lawful general regulation by possessing $3,539.00 in United States currency (1 specification), and violating another lawful general regulation by causing opium to be transported on Air Force aircraft for personal financial gain (3 specifications), in violation of Articles 134 and 92, Code, supra, 10 USC §§ 934 and 892. He was sentenced to dismissal, total forfeitures, and confinement at hard labor for sixteen years. On May 31, 1970, the convening authority approved the findings and sentence.

On February 19, 1971, the United States Air Force Court of Military Review affirmed the conviction but, taking into account the accused's previously outstanding service record, reduced the period of confinement to twelve years.

Our limited grant of review calls upon us to decide whether or not the search of accused's person and the seizure of items found offend the Fourth Amendment to the United States Constitution or the requirements of paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition), rendering the admission of such evidence error prejudicial to the accused.

### WRITTEN AUTHORIZATION TO SEARCH

The Government submits that the written authority to search was broader in its scope than the clear authority it sets forth in unambiguous language. Presumably this position is based upon the contention that since neither the officer who authorized the search nor those to whom the authority was given had knowledge of the fact that the word "person" had been stricken from the language of the document, that all persons privy to the facts attendant to the conversation believed the document to be other than it is.

For good reason this Court has expressed its affection for the procedure of setting forth the authority to search in writing. See United States v Hartsook, 15 USCMA 291, 298, 35 CMR 263 (1965). Obviously, if written authority can be expanded by merely an erroneous assumption that it authorized a search and seizure which it clearly does not, the salutary benefit of such writings would be rendered nugatory. We do not find sufficient evidence that the written authority to search the accused's premises reasonably can be said to include a search of his person.

### ORAL AUTHORIZATION TO SEARCH

Special Agents Welch and Walsh both testified that they informed the commanding officer of the requirement to search the accused and requested the authority. In response Colonel Marek stated something to the effect: " 'Go get 'em,' " or " 'Have at it.' " However, a careful examination of Colonel Marek's testimony does not reveal that he specifically authorized a search of the person of the accused. We are mindful that Colonel Marek stated it was his *"assumption . . .* the person and the quarters would be searched." (Emphasis supplied.) Moreover, as set forth hereinabove, the commanding officer stated that a search *normally* includes the person and the quarters. Additionally, Colonel Marek stated a search of the person "was not discussed."

Authorization to search and seize must be reasonably specific and cannot be established by resort to inferences drawn from what is stated to be required to be searched by those requesting the authority or inferences based upon assumptions of normal procedure.

The burden of courts to evaluate the circumstances surrounding the oral granting of authority to ▪ search already is weighty and any further load would be intolerable. Even though probable cause to search existed and authority to search was given, we simply do not find from the facts sufficient evidence that the commanding officer specifically authorized a search of the person of the accused.

## SEARCH INCIDENTAL TO APPREHENSION

Prior decisions of this Court establish our commitment to the principle that reasonable searches incident to arrest or apprehension are lawful. See United States v Dutcher, 7 USCMA 439, 442, 22 CMR 229 (1956). Appellant submits that the legality of the search of his person cannot be deemed a lawful search incident to apprehension for the reason that he was not informed, orally or in writing, that he was under apprehension before his person was searched. He invites our attention to paragraph 19c, Manual, supra, which provides:

"An apprehension is effected by clearly notifying the person to be apprehended that he is thereby taken into custody. The order of apprehension may be either oral or written."

Research does not reveal that this Court has ever required that any specific language be used to apprise one of apprehension. On the other hand in Dutcher, supra, at pages 442, 443, the opinion of the Court states:

"Some argument is advanced that the search was not incident to legal apprehension because the officer failed to notify the accused that he was taken into custody. Obvi-

ously, it is the better practice to advise the accused specifically of his status before the search is instigated, but here there was no doubt in the accused's or the officer's mind that the order was given to deter the accused from re-entering the house and restrict his freedom of movement, because he was suspected of having committed an offense."

If the totality of facts reasonably indicate that both the accused and those possessing the power to ▪ apprehend are aware that the accused's personal liberty has been restrained, even in the absence of verbalization, an apprehension is complete.

In view of the facts set forth above, probable cause for apprehension of the accused was manifest. ▪ Special Agent Walsh asked the accused to step in his (accused's) room and handed him the written authority to search. The accused read it and stated that he understood it. He at that time was aware of his suspected involvement in an offense involving opium. Next, he was advised of his rights pursuant to Article 31, Code, supra, and queried whether he wanted a lawyer, to which he replied, no. Thereafter, a search of his person was conducted.

As we view it, such evidence is sufficient to indicate that appellant knew or reasonably should have known he had been apprehended.

Accordingly, we find no prejudicial error in the admission into evidence of the items seized after the search of his person. We affirm the decision of the Court of Military Review.

Chief Judge DARDEN concurs.

QUINN, Judge (concurring in the result):

In United States v Dutcher, 7 USCMA 439, 22 CMR 229 (1956), a majority of the Court determined that a pretrial statement by the accused had properly been admitted into evidence "[r]egardless of the purported illegality of the search." Opinion by

**181**

Chief Judge Quinn at page 444, concurred in by Judge Ferguson. The excerpt in the principal opinion here from the plurality opinion in *Dutcher* may be persuasive as to principle (see Holt v Simpson, 340 F2d 853 (CA7th Cir) (1965)), but the facts in this case are, in my opinion, so different from those in *Dutcher* as to make *Dutcher* inapplicable. Here, neither agent involved in the search indicated that he had cause or authority to apprehend or arrest the accused. According to Agent Castellucio's testimony, the accused was searched because he was "[t]echnically" subject to the agents' "custody" as soon as they arrived at accused's quarters "by virtue of the fact that we are criminal investigators." Authority to investigate does not itself confer authority either to search or to restrain a suspect or accused. I agree with the court in United States v Haywood, 284 F Supp 245, 249 (ED La) (1968), which, assessing circumstances substantially similar to those in issue, said that had the agents thought they had sufficient cause to apprehend the accused "they would have . . . arrested . . . [him] on sighting him immediately upon entry into his residence." I, therefore, disagree with the majority's conclusion that the search was incident to the accused's arrest.

Turning to the authority to search, I do not agree with the majority's apparent conclusion that a written authorization is definitive evidence of the basis for, or the terms of, the authorization. Constitutionally, a written warrant insufficient on its face to show probable cause can properly be supplemented by oral testimony as to the matters presented to the magistrate to demonstrate that the warrant was issued upon probable cause. Sherrick v Eyman, 389 F2d 648, 651–652 (CA9th Cir) (1968), certiorari denied, 393 US 874, 21 L Ed 2d 144, 89 S Ct 167 (1968); State v Walcott, 72 Wash 2d 959, 435 P2d 994, 999 (1968), certiorari denied, 393 US 890, 21 L Ed 2d 169, 89 S Ct 211 (1968), and State v Christofferson, 74 Wash 2d 154, 443 P2d 815 (1968), certiorari denied, 393 US 1090, 21 L Ed 2d 783, 89 S Ct 855 (1969). Military law does not prescribe a more strict rule than the Constitution authorizes. Here, both the agent who applied for the authority to search and the commanding officer who issued it testified that the writing was intended to authorize search of the accused's person, and each believed, at all times previous to the search, that the writing, in fact, expressed that authority. It is significant that the writing authorizing a search of Major Davis extended to search of his person. Davis was implicated with the accused. It is apparent, therefore, that an inadvertent error was made in regard to the accused. In my opinion, the testimony as to what actually transpired before the commander and, as to what he intended, can properly be considered in supplementation of the written authorization. This evidence is sufficient to support the trial judge's conclusion that the commander's authorization included authority to search the accused's person. For this reason, I join in affirming the decision of the Court of Military Review.