UNITED STATES, Appellee,

v.

James D. KINANE, Aviation Machinist's Mate (Jet Engine Mechanic) Airman Apprentice, U. S. Navy, Appellant.

No. 30,114.

U. S. Court of Military Appeals.

Feb. 20, 1976.

2. *See United States v. Wilson,* 7 U.S.C.M.A. 656, 23 C.M.R. 120 (1957).

310

*Milton Silverman, Esquire*, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Walter A. Smith, Jr.*, JAGC, USNR.

*Lieutenant Mark D. Wigder*, JAGC, USNR, argued the cause for Appellee, United States. With him on the brief were

*Lieutenant Colonel P. N. Kress*, USMC, and *Lieutenant Thomas L. Earp*, JAGC, USNR.

## OPINION OF THE COURT

FLETCHER, Chief Judge:

In the course of her normal duties issuing identification cards to military personnel, Mrs. Perkins discovered that seven consecutive cards, which had not been entered in her log book, were missing. After attempts to locate the cards by checking with the other individuals who were cleared to work behind the security counter proved fruitless, Mrs. Perkins promptly reported the incident to Detective Saunders, a security official. She advised him that two restricted enlisted men, one of whom was the accused and the other an individual named Slater, had swept the floor inside the security counter during the 1-hour time frame within which the ID cards disappeared.

Another member of the security division, Detective Harris, responded to Mrs. Perkins' complaint. Kinane and Slater also were located and were brought to the office from which the cards had disappeared. According to Detective Harris, he first identified himself to the appellant, advised him that he was suspected of larceny of several ID cards, warned him of his "rights" from a card, and then asked "if he would mind emptying his pockets." Appellant recalled the incident differently maintaining that he was never advised of his rights, and that he was *told* to empty his pockets.

In response to Detective Harris' suggestion, Kinane produced the missing ID cards and then asked, "What now?" Harris advised him, "You're arrested. Let's go topside." He then turned the appellant over to Detective Ogden who "completed a search incident to an arrest and discovered a baggie of marijuana."

At trial, the military judge denied the appellant's timely motion to suppress the

seized marihuana and ID cards and, in addition, ruled that the appellant's subsequent admissions to a police investigator were voluntary and properly obtained. The propriety of those rulings forms the basis for this appeal.

### I

■ Urging that Detective Harris showed commendable concern for appellant's personal privacy by allowing him to remove the items from his pockets, the Government nevertheless acknowledges that Harris' conduct constituted a search within the ambit of the Fourth Amendment. The concession is appropriate. *United States v. Cuthbert*, 11 U.S.C.M.A. 272, 29 C.M.R. 88 (1960); *see United States v. Pyatt*, 22 U.S.C.M.A. 84, 46 C.M.R. 84 (1972).

The identity of the hand placed in the appellant's pocket to retrieve the ID cards is not controlling. Rather, it was Detective Harris' decision to intrude into Kinane's privacy which we view as determinative in concluding that the police conduct in this instance constituted a search, for it is the right to be free from unreasonable governmental intrusion which the Fourth Amendment protects. *See Warden v. Hayden*, 387 U.S. 294, 301, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). *See also Cardwell v. Lewis*, 417 U.S. 583, 589, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Appellant's relinquishment of the ID cards must, therefore, be measured against Fourth Amendment standards as they have been applied to the military community.[1]

### II

■ The absence of an authorization to search issued by one possessing the requisite authority reduces the possible justifica-

---

1. To the extent that Detective Harris' conduct required the appellant to participate, without his consent, in the production of evidence which was self-incriminating, Harris' order was also violative of Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. *See United*

States v. Cuthbert*, 11 U.S.C.M.A. 272, 275, 29 C.M.R. 88, 91 (1960) (dissenting opinion); *United States v. Nowling*, 9 U.S.C.M.A. 100, 25 C.M.R. 362 (1958). *See also United States v. Pyatt*, 22 U.S.C.M.A. 84, 46 C.M.R. 84 (1972).

tions for this search to three of the warrantless exceptions to the Fourth Amendment: a consent search, a necessity search, or a search incident to apprehension or custodial arrest. Both the consent and necessity search theories have been abandoned by appellate Government counsel. Although not stating the basis for its affirmance of the trial judge's ruling on the search issues, the Navy Court of Military Review appears to have rejected the final alternative in its opinion.

## A

■ Whether Detective Harris' action be viewed as an order to the accused to empty his pockets or as an official request that he do so, the result remains the same. As acknowledged by the Government, in neither instance can Kinane's acquiescence be termed anything more than mere submission to lawful authority.[2] As such, the search cannot be justified as one which flowed from appellant's freely given consent. See generally Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

## B

■ The necessity search, as it has come to be known, requires the existence of at least two factors. Not only must the police official have probable cause to believe an individual is in possession of criminal goods, but the search also must be shown to be necessary to prevent the immediate removal or destruction of the evidence. United States v. Soto, 16 U.S.C.M.A. 583, 37 C.M.R. 203 (1967). In addition, the Supreme Court has not applied the necessity search doctrine to persons or dwellings, but instead has limited its scope to vehicles. Compare Cardwell v. Lewis, supra, and Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), with Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); Chambers v. Maroney, 399 U.S. 42, 48–49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). See also Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).[3]

The rationale for such an approach is logically rooted in the usual absence of the immediacy element where dwellings or persons are concerned.[4] The risk of destruction or removal of contraband from dwellings or persons generally can be minimized by procedures which are more reasonable and hence less offensive to the Fourth Amendment. In the case of dwellings, the risk normally can be eliminated by placing

---

2. United States v. Vasquez, 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973); United States v. Alaniz, 9 U.S.C.M.A. 533, 26 C.M.R. 313 (1958).

3. Several intermediate federal courts have applied the Carroll doctrine to suitcases. See, e. g., United States v. Wilson, 524 F.2d 595 (8th Cir. 1975); United States v. Johnson, 467 F.2d 630 (2d Cir. 1972); United States v. Mehciz, 437 F.2d 145 (9th Cir. 1971), cert. denied, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971). For an analysis of the import of these decisions, see Note, Mobility Reconsidered: Extending the Carroll Doctrine to Movable Items, 58 Iowa L.Rev. 1134, 1155–60 (1973).

4. Our reading of Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), satisfies us that it does not turn on a necessity search concept even though arguably it satisfies the threshold requirements for such a search. In actuality, the Supreme Court focused on the scope of a search incident to arrest in holding that the warrantless taking of a blood sample immediately after arrest was a commonplace medical procedure justified by the likelihood of alcohol dissipation if the sampling had been delayed to secure a warrant.

> We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

Id. at 770–71, 86 S.Ct. at 1836. Even though necessity, in a layman's sense, was a "special fact" considered by the Court in resolving the scope of the search in question, it was not a "necessity search" as that term is technically used. Rather, as the Supreme Court stated, the warrantless search was "an appropriate incident to petitioner's arrest." Id.

the premises under surveillance pending the issuance of a search warrant.[5] Individuals in possession of contraband are, of course, subject to apprehension and search incident thereto.[6]

## C

▮▮▮ Because the search of an individual is the concern in this case, the appropriate inquiry is whether the search may be justified as incident to apprehension or custodial arrest.[7] *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Fleener,* 21 U.S.C. M.A. 174, 44 C.M.R. 228 (1972). In *United States v. Brashears,* 21 U.S.C.M.A. 552, 554, 45 C.M.R. 326, 328 (1972), we sanctioned *"a relatively extensive exploration of the person"* if conducted incident to a lawful apprehension. The Supreme Court subsequently endorsed a thorough *Chimel* search of the person incident to custodial arrest[8] irrespective of whether the search was necessary to assure the protection of the police officer or to prevent the destruction of evidence, the two considerations upon which *Chimel* originally was bottomed. *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

> It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.[9]

Thus, the crucial prerequisite for such a contemporaneous[10] search is a prior lawful apprehension or custodial arrest.[11]

Article 9(a), Uniform Code of Military Justice, 10 U.S.C. § 809(a), specifies that "[a]rrest is the restraint of a person by an order . . . directing him to remain within certain specified limits." Paragraph 19c, Manual for Courts-Martial, United States, 1969 (Rev.), provides:

> An apprehension is effected by clearly notifying the person to be apprehended that he is thereby taken into custody. The order of apprehension may be either oral or written.

▮▮▮ Inasmuch as the first sentence of the Manual provision merely implements Articles 7(a) and 9(a) of the UCMJ and is not inconsistent therewith, we believe it is entitled to the force and effect of law. *See United States v. Montgomery,* 20 U.S.C. M.A. 35, 42 C.M.R. 227 (1970); *United States v. Tobin,* 17 U.S.C.M.A. 625, 38 C.M.R. 423 (1968); *United States v. Teague,* 3 U.S.C.M.A. 317, 12 C.M.R. 73 (1953). To the extent that our language in *United States v. Fleener, supra* at 181, 44 C.M.R. at 235, suggested that temporary detention,[12]

---

5. A warrantless search of limited scope incident to a lawful apprehension is also permissible. *See, e. g., Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *Von Cleef v. New Jersey,* 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969); *United States v. Ross,* 13 U.S.C.M.A. 432, 32 C.M.R. 432 (1963).

6. To the extent that *United States v. Davis,* 4 U.S.C.M.A. 577, 16 C.M.R. 151 (1954) and *United States v. Swanson,* 3 U.S.C.M.A. 671, 14 C.M.R. 89 (1954) exceed the scope of the *Carroll* doctrine and relax existing requirements of probable cause, *Davis* and *Swanson* are overruled. *See Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

7. The terms "apprehension" and "custodial arrest" or "arrest" are synonymous in military practice. *United States v. Ross,* 13 U.S.C.M.A. 432, 435, 32 C.M.R. 432, 435 (1963). *See* Articles 7(a) and 9(a), Uniform Code of Military Justice, 10 U.S.C. §§ 807(a) and 809(a).

8. *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

9. *United States v. Robinson, supra* at 235, 94 S.Ct. at 477.

10. *United States v. Decker,* 16 U.S.C.M.A. 397, 37 C.M.R. 17 (1966); *see United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

11. Our disposition of the custodial arrest question makes it unnecessary to resolve whether Detective Harris had probable cause to arrest the accused prior to the search.

12. The Supreme Court has been careful to distinguish an investigative stop from a custodial arrest in resolving the scope of warrantless searches applicable to each. *United States v.*

in and of itself constitutes notification of custodial arrest, that decision is overruled [13] as being inconsistent with the plain meaning of the statute and the Manual. *See United States v. Sosville*, 22 U.S.C.M.A. 317, 46 C.M.R. 317 (1973); *United States v. Davis*, 12 U.S.C.M.A. 576, 578, 31 C.M.R. 162, 164 (1961). Custodial arrest implies a more permanent deprivation of liberty evidenced by an actual or constructive order "directing [an individual] . . . to remain within certain specified limits." Article 9(a), UCMJ. *See Cupp v. Murphy*, 412 U.S. 291, 294, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). This order may be either by word of mouth, by writing, or by the circumstances surrounding the arrest. Inasmuch as Article 9(a) of the Code does not limit the order to an oral or written command, so much of the Manual provision as attempts to establish such a requirement is inoperative. *See* Article 36, UCMJ, 10 U.S.C. § 836.

■ The question of whether an apprehension has occurred, as opposed to whether an apprehension was lawful, is primarily one of fact to be resolved by the factfinders. *Sibron v. New York*, 392 U.S. 40, 67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Rios v. United States*, 364 U.S. 253, 261–62, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). The accused testified that he did not consider himself under apprehension at the time of the search. Detective Harris, on the other hand, testified that he believed otherwise since he had "put [the accused] under suspicion" and detained him. On cross-examination, however, Detective Harris admitted that he did not inform the accused that he was under arrest until after the ID cards were discovered. Further, Harris admitted that the "normal pat-down search" which he routinely conducted when taking an individual into custody was not carried out until after the ID cards were found and the accused was turned over to Detective Ogden.

■ In its opinion, the Navy Court of Military Review observed that, after Kinane relinquished the ID cards, "[a]t this point appellant was placed under arrest, taken to the investigations office and [again] searched." Because the Court of Military Review's finding of fact as to when the actual custodial arrest occurred is supported by evidence of record, we are bound by that determination. *United States v. Phifer*, 18 U.S.C.M.A. 508, 40 C.M.R. 220 (1969); *see United States v. Lohr*, 21 U.S.C.M.A. 448, 45 C.M.R. 222 (1972); *United States v. Baldwin*, 17 U.S.C.M.A. 72, 37 C.M.R. 336 (1967).

■ The only question left for resolution is whether a *Chimel*-type search may precede a custodial arrest. With the exception of several pre-*Sibron* decisions by this Court,[14] the answer until recently was that it could not. *Sibron v. New York, supra*, 392 U.S. at 63, 88 S.Ct. 1889, *citing Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). However, in *Cupp v. Murphy, supra*, the Supreme Court sanctioned the taking of fingernail scrapings *prior to* custodial arrest. The Court nevertheless made clear that the scope of such a search was not as broad as that sanctioned in *United States v. Robinson, supra*. While the taking of scrapings from under a defendant's fingernails goes beyond a seizure of "physical characteristics . . . constantly exposed to the public,"[15] the intrusion still was based upon probable cause and was limited to "something that was exposed to all who saw the defendant." *State v. Sharpe*, 284 N.C. 157, 200 S.E.2d 44, 48

---

*Robinson, supra* 414 U.S. at 234–35, 94 S.Ct. 467.

**13.** *See Moran v. United States*, 404 F.2d 663, 666 (10th Cir. 1968), *citing Brinegar v. United States*, 165 F.2d 512 (10th Cir. 1947), *affirmed*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1947). *See also United States v. Ware*, 457 F.2d 828, 830 (7th Cir. 1972); *United States v. Sanchez*, 450 F.2d 525, 528 (10th Cir. 1971).

**14.** *United States v. Dutcher*, 7 U.S.C.M.A. 439, 22 C.M.R. 229 (1956); *United States v. Florence*, 1 U.S.C.M.A. 620, 5 C.M.R. 48 (1952).

**15.** *See United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

(1973). *Accord, State v. Parsons*, 513 S.W.2d 430 (Mo.1974). In addition, the intrusion was authorized only to prevent the destruction of "highly evanescent evidence." *Cupp v. Murphy, supra*, 412 U.S. at 296, 93 S.Ct. 2000. *See People v. Todd*, 59 Ill.2d 534, 322 N.E.2d 447 (1975); *State v. Kloucek*, 17 Or.App. 74, 520 P.2d 458 (1974). Finally, the pre-arrest search did not offend the investigatory seizure ban imposed in *Davis v. Mississippi*, 394 U.S. 721, 726, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). *See Commonwealth v. Quarles*, 229 Pa.Super. 363, 324 A.2d 452 (1974). We believe the investigator's search for the missing ID cards in this case exceeded the minimal intrusion prior to custodial arrest [16] which has been sanctioned by the Supreme Court.[17] As a result, the search satisfies neither the apprehension prerequisite for a *Chimel* search nor the *Cupp v. Murphy* exception. No justification for a broader rule in the military context has been advanced, nor do we believe military considerations exist which warrant a departure from the prevailing Supreme Court view. Hence, the trial judge erred in admitting the ID cards into evidence.

### III

The subsequently seized marihuana and appellant's later confession also errone-ously were admitted into evidence by the trial judge since both were obtained as a direct result of the initial unlawful search. *United States v. Pyatt, supra. See also Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

The decision of the United States Navy Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Navy for remand to the Court of Military Review for action not inconsistent with this opinion.

Senior Judge FERGUSON concurs.

COOK, Judge (dissenting):

I disagree with a number of statements in the principal opinion. For example, I do not agree with the assertion in section IIB that the "Supreme Court has not applied the necessity search doctrine to persons or dwellings." I believe that the determinations of the Supreme Court in some of the cited cases are to the contrary. In *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966), the Court upheld the taking of a sample of blood from the defendant for the purpose of determining its alcoholic content because the police officer was "confronted with an emergency,

---

**16.** It has been suggested by the dissenting judge that arrest or apprehension may be equated with seizure of the person in determining whether a given search is incidental to arrest. Actions of a police official which constitute a seizure of the person under the Fourth Amendment and which trigger the *accused's rights* under that amendment are utterly distinct from situations involving a statutory arrest or apprehension of the person which triggers the *policeman's right* to search incident thereto without a warrant. Article 9(a), UCMJ, 10 U.S.C. § 809(a), and paragraph 19c, Manual for Courts-Martial, United States, 1969 (Rev.), specify what constitutes a custodial arrest or apprehension thus placing definitional boundaries on traditional searches incident to arrest in military practice. On the other hand, any limitation or restraint of an individual's freedom of movement by a police official constitutes a seizure of the person thereby setting in motion Fourth Amendment safeguards. *Cupp v. Murphy*, 412 U.S. 291, 294, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), *citing United States v. Dionisio, supra; Davis v. Mississippi*, 394 U.S.

721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As in the present case, *Cupp* provides a clear example of a situation in which the police official's conduct, while constituting a seizure of the person, did not rise to the level of an arrest. 412 U.S. at 294, 93 S.Ct. 2000. Furthermore, the resolution of the scope of search question in *Cupp* implicitly rejects Judge Cook's eclectic approach to the Fourth Amendment wherein statutory arrest is commingled with seizure of the person. The Supreme Court specifically stated that the *Cupp* search was a pre-arrest one of limited scope as opposed to a post-arrest search of *Gustafson-Robinson* scope. See notes 9 and 10, *supra*.

**17.** In our view, *State v. LeBlanc*, 347 A.2d 590 (Me.1975), sanctions a search of broader scope than the minimal pre-arrest intrusion permitted in *Cupp v. Murphy, supra*, and is therefore violative of the Fourth Amendment.

in which the delay necessary to obtain a warrant" would have resulted in loss of the evidence. In *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the defendant was not under formal arrest, but there was probable cause to indicate he was involved in the criminal death of his wife; the Supreme Court upheld the immediate scraping of matter from under the defendant's fingernails by the police as "necessary to preserve the highly evanescent evidence." *Id.* at 296, 93 S.Ct. at 2004. The important point of my disagreement, however, is with the result reached by the majority.

A constitutional issue is presented in seizures of the person "which do not eventuate in a trip to the station house and prosecution for crime—'arrest' in traditional terminology." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). "[W]henever," said the Court, "a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id. See also Davis v. Mississippi*, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

In section IIC of its opinion, the majority observes that the Court of Military Review found that the accused was "placed under arrest" after he had relinquished the ID cards. It accepts the finding as fixing the moment the accused was deprived of his freedom of movement for the purpose of an allowable search. I believe the Court of Military Review's comment merely refers to the time Detective Harris formally declared to the accused that he was under arrest. As I read it, Harris' testimony leaves no doubt that the accused was under official control when he took him aside and informed him of his right to remain silent. The following excerpt from Harris' testimony emphasizes the point:

> Q. Did you feel that he was under arrest.
> A. Yes, I did.
> Q. Why did you believe that?
> A. I was detaining him from his going about his appointed duties. I also asked him to step in my area, and I put him under suspicion at that point.

The interference with the accused's freedom of movement at that point in the accused's encounter with Harris is significant. The question, therefore, is whether the interference was reasonable in constitutional terms. In my opinion, it was.

The ID card issuing office of the security department of the air station closed at 4:00 p.m. Just before closing, Mrs. Perkins discovered that sometime between 3:00 and 3:50 p.m., a number of blank, active duty identification cards were missing from a box on a shelf under the counter in the office. The office was arranged with a long counter separating the public portion from the staff portion. Only two persons not on the staff were observed behind the counter during the crucial period. These were the accused and his co-worker, Slater. Both were "restricted" persons and had been engaged in cleaning and buffing the floor.

When Mrs. Perkins discovered the loss, she checked the remaining cards to see if the missing cards had merely been misplaced. She determined they had not been. She also checked with the only other staff person who had been present during the period, to be sure she had not issued the cards but failed "to log them in," as required. She ascertained the cards had not been issued. Having excluded the legitimate probabilities for the absence of the cards, Mrs. Perkins concluded, naturally and correctly, I believe, that the accused or Slater or both had probably taken the cards. She reported the loss and the circumstances as recited above to the assistant security officer, who, in turn, called for an investigator and "summoned" the accused and Slater, who were then in the parking lot.

The accused and Slater had completed their tasks and were "mak[ing] like . . . [they] were doing some work just until secure time," which was only minutes away. Petty Officer Martin, who had been dispatched to get them, escorted them to the office where, as the majority opinion indicates, Detective Harris immediately separated the accused and Slater, took the ac-

cused to one side, advised him of his rights, and ordered him to empty his pockets. In these circumstances, I believe that *Cupp v. Murphy, supra,* governs the disposition of the case.

In *Cupp,* the defendant's wife had been strangled to death. Abrasions and lacerations were found at her throat. There were no indications of a break in or robbery. The defendant, then living apart from his wife, was notified, and he voluntarily agreed to appear at the police station for questioning. In the presence of retained counsel, he conferred with police officers. An officer noticed a dark spot on the defendant's finger. Suspecting that the spot was dry blood, and aware that evidence of strangulation is often found under the fingernails of the strangler, the officer asked the defendant to allow scrapings to be taken from under his fingernails. The defendant refused. Thereupon, despite the defendant's protests, a police officer scraped matter from under his fingernails. Later, the matter was determined to be fabric from the victim's nightgown and traces of skin and blood cells. Over defense objection, this evidence was admitted at the defendant's trial for the murder of his wife. Sustaining the admissibility of the scrapings, the Supreme Court said:[1]

> It is also undisputed that the police did not obtain an arrest warrant or formally "arrest" the respondent, as that term is understood under Oregon law.[1] The re-
>
> [1] Oregon defines arrest as "the taking of a person into custody so that he may be held to answer for a crime." Ore.Rev.Stat. § 133.210.
>
> spondent was detained only long enough to take the fingernail scrapings, and was not formally "arrested" until approximately one month later. Nevertheless, the detention of the respondent against his will constituted a seizure of his person, and the Fourth Amendment guarantee of freedom from "unreasonable searches and seizures" is clearly implicated. . . .

In *Davis,* the Court held that fingerprints obtained during the brief detention of persons seized in a police dragnet procedure, without probable cause, were inadmissible in evidence. . . .

The respondent in this case, like Davis, was briefly detained at the station house. Yet, here, there was, as three courts have found, probable cause to believe that the respondent had committed the murder. The vice of the detention in *Davis* is therefore absent in the case before us.

. . .

We believe this search was constitutionally permissible under the principles of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. . . .

At the time Murphy was being detained at the station house, he was obviously aware of the detectives' suspicions. Though he did not have the full warning of official suspicion that a formal arrest provides, Murphy was sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what evidence he could without attracting further attention. Testimony at trial indicated that after he refused to consent to the taking of fingernail samples, he put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a "metalic sound, such as keys or change rattling" was heard. The rationale of *Chimel,* in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails. . . .

On the facts of this case, considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments. . . .

1. *Cupp v. Murphy,* 412 U.S. 291, 294–96, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).

In my opinion, Detective Harris had probable cause to believe the accused was involved in the disappearance of the ID cards. I am also satisfied that if Harris had not taken immediate action the cards would have disappeared. To this point, the situation that confronted Harris is exactly like that which confronted the police in *Cupp.* True, in *Cupp,* the evidence was hidden under the defendant's fingernails, while here it was hidden in the accused's pocket; the important fact, however, is not where the evidence was hidden, but whether the police could intrude into the hiding place. *Cupp* held that intrusion was reasonable and, therefore, constitutional. I am satisfied that, under *Cupp,* what Harris did was equally sensible and constitutionally sound. I conclude, therefore, that accused's right to be free from unreasonable search and seizure was not violated. *See State v. LeBlanc,* 347 A.2d 590 (Me.1975).

In footnote 1, the majority suggests that the order to the accused to empty his pockets constituted a violation of his right to remain silent under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. In my opinion, the article is not involved in the situation presented here. I do not regard an order to a person to allow peaceful execution of a lawful search to be such compulsion as violates his right against self-incrimination. Surely, a police officer, having a valid warrant to search an apartment, can call upon the occupant to open the door to allow him in for the purpose of executing the warrant instead of immediately breaking down the door to gain entry. I adhere to the determination in *United States v. Cuthbert,* 11 U.S.C.M.A. 272, 274, 29 C.M.R. 88, 90 (1960), that an order of the kind in issue calls upon the accused to do nothing but "comply with the terms of the search."

I would sustain the trial ruling admitting the cards into evidence, and I would affirm the decision of the Navy Court of Military Review.