**UNITED STATES**

v.

**Sergeant Jimmy C. DAVIS, FR 315–66–7218 United States Air Force.**

**ACM S25426.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 28 May 1981.

Decided 7 May 1982.

---

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain J. Laurens Tullock.

Appellate Counsel for the United States: Colonel James P. Porter and Major Michael J. Hoover.

Before HODGSON, POWELL, and MILLER Appellate Military Judges.

## DECISION

**PER CURIAM:**

Contrary to his pleas, the accused was convicted by a special court-martial, military judge alone, of selling marihuana and stealing United States property valued at over $100.00, in violation of Articles 134 and 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 934, 921. His sentence consists of a bad conduct discharge, confinement at hard labor for five months, forfeiture of $334.00 per month for five months, and reduction to airman basic.

We have examined the record of trial, the assignment of errors, and the Government's response thereto and have concluded that the findings are correct in law and fact and that no error materially prejudicial to the substantial rights of the accused was committed. The defense assertion that the "warrantless" apprehension of the accused in his quarters violated the rule enunciated in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), is inapposite. Not only does the evidence of record support the military judge's conclusion that the apprehension occurred *outside* the accused's quarters, but no evidence was seized from within his quarters. Accordingly, the findings of guilty and sentence are

AFFIRMED.

MILLER, Judge (concurring in the result):

I disagree with the means by which the majority disposed of the *Payton* (*Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)) issue. In my opinion, as a matter of law, the accused was apprehended inside his quarters. The *Payton* issue, therefore, is not inapposite to the facts of this case. After reviewing military interpretations of *Payton*, however, I conclude that sufficient exigent circumstances existed to validate a "warrantless" in-quarters apprehension under *Payton*. Consequently, I concur in the majority's result.

I

On 22 January 1981, agents of the Air Force Office of Special Investigations (OSI) began making preparations for a "buy-bust" drug operation. Pursuant to the general scheme of such operations, X, an airman acting as a confidential informant, was provided with $210.00 of marked money to purchase three pounds of marihuana from the accused. The money was provided to him, following a thorough search of his person, at 1345 hours, one-half hour before he had arranged to meet the accused in the base theater parking lot where the purchase was to be consummated.

OSI agents then surveiled X as he went to the parking lot, where agents had previ-

ously been secreted to observe the proposed transaction. X met the accused at 1415 hours, as previously arranged, but left the parking lot without giving the previously arranged signal to indicate that the anticipated "buy" had been consummated. He immediately returned to his "safe house." There, presumably at about 1500 hours, he explained to OSI that the accused had insisted on changing the time and place of the sale to 1700 hours at the accused's on-base residence.

The agent-in-charge decided to continue the "buy-bust" operation, without interruption. X was allowed to retain the marked money, and he remained with the OSI "buy-bust" team while the strategy of the continuing operation was modified to conform to the newly established time and location.

By 1700 hours, agents were once again secreted, this time at newly selected locations in the vicinity of the accused's residence. Once again OSI surveiled X as he went to the proposed site of the "buy." This time, upon his arrival, X entered the accused's residence. A short time later, X departed the residence carrying a package. He was accompanied by the accused. Both X and the accused walked to the residence's carport in which X had parked his car. As X lifted his car's hatch to put his package inside his vehicle, the accused turned and walked back to the front door of his house.

Because lifting the hatch was the pre-arranged signal by which X was to indicate that the "buy" had been consummated, two agents, secreted in a nearby automobile, immediately drove to the front of the accused's house. Their car "screeched" to a halt just as the accused shut the front door behind him, having reentered his house. One of the agents, having observed the accused's entry into the house, jumped from the car, and ran up to the house door and opened it, placing one foot across the door's threshold. From that position, he spotted the accused walking from the kitchen toward a bedroom with his wife. At that point, the agent yelled at the accused, directing him to "Come here." The accused, recognizing the agent as a member of OSI,

complied with the demand, and followed the agent as he backed from the house.

Once outside, the agent grabbed the accused, propped him against a car, and conducted a search incident to apprehension. Nothing other than "Come here," was said to the accused until, after the marked money had been recovered, a second agent, who had just arrived, began reading the accused his rights. In the meantime, the other agent from the car, recovered the package X had carried from the house. It contained three pounds of marihuana.

## II

In court, the agent who stepped over the threshold of the accused's quarters testified that in his opinion he did not apprehend the accused at the point he hollered "Come here." Rather his apprehension of the accused occurred at the time, after having withdrawn his foot from inside the house, the accused came close enough for him to physically grab. Nevertheless, he acknowledged that his sole purpose and intent in opening the door to the accused's quarters and in stepping across its threshold was to "apprehend" the accused and place him in physical "custody." He also acknowledged that he meant his presence in straddling the door "to detain the accused before he could dispose of the money." Had the accused attempted to flee, the agent admitted he "would have reacted to his actions." The agent also testified that he was in "hot pursuit" of the accused when he broke and entered the accused's quarters.

Based upon this evidence, defense counsel moved to suppress both the marked money and any testimony, either identifying the accused as having possessed such currency or having any other involvement in the "buy-bust" transaction. The military judge in denying this motion found:

One, [the] Special Agent['s] ... partial entry into the accused's quarters, on that date, occurred while he was in hot pursuit of the accused and was necessitated by the exigent circumstances which then existed;

Two, that the search of the accused's person was conducted incident to a lawful apprehension, as defined in Rule 314(g) of the Military Rules of Evidence, which was made outside the accused's quarters; [and]

Three, that no substantial rights of the accused were prejudiced as a result of [the] Special Agent['s] ... partial entry into his home, by [the] Special Agent['s] ... directing him to step outside his quarters, or by the subsequent apprehension and search which took place.

### III

Under applicable military law:

If the totality of facts reasonably indicate that both the accused and those possessing the power to apprehend are aware that the accused's liberty has been restrained, even in the absence of verbalization, an apprehension is complete.

*United States v. Fleener,* 21 U.S.C.M.A. 174, 181, 44 C.M.R. 228, 235 (1972).

Applying these facts to this statement of law, the apprehending agent not only "hotly pursued" the accused into his house for the purpose of apprehending him, but, once inside, ordered him to "Come here," in an effort to *"detain* the accused before he could dispose of the money." Had the accused attempted to flee, the agent would have reacted in accordance with the accused's actions. The apprehending agent both intended to, and in fact did, restrain the accused's liberty while he was in the accused's quarters.

Although the accused did not testify, the fact is, that immediately after the accused had illegally sold a substantial quantity of marihuana and while the money from the sale was still on him, a man he recognized as an OSI agent appeared inside his home and ordered him outside. The accused acquiesced, following the agent. Indisputably, the accused believed at that time that his liberty had been restrained. Certainly, he did not consider himself free to disregard the agent's direction and continue about his normal business.

Regardless of the military judge's finding, when the principles of *Fleener, supra,* are applied to facts of this case, the accused's apprehension occurred in his quarters, as a matter of law.

### IV

Turning to the issue of whether this "warrantless" apprehension of the accused in his quarters was justified by exigent circumstances, I note that, even prior to *Payton, supra,* the Army Court of Military Review held that:

[A]bsent exigent circumstances, appropriate authorization by a responsible commander based upon probable cause must be obtained before a private dwelling, [excluding barracks rooms] may be entered to make an arrest even though the person entering possesses authority to arrest and has probable cause to do so.

*United States v. Jamison,* 2 M.J. 906, 909–910 (A.C.M.R.1976).

A few years after publication of *Jamison, supra,* and still prior to the Supreme Court's decision in *Payton, supra,* the Court of Military Appeals, finding the rationale of the Army Court in that case compellingly persuasive, issued a summary disposition in *United States v. Davis,* 8 M.J. 79 (C.M.A. 1979). In *Davis,* the Court not only adopted the holding of *Jamison,* but expanded that case's holding so as to encompass barracks rooms within the category of private dwellings that require apprehension authorizations to validate arrests occurring therein.

In October 1981, the Court, dealing with an Army "buy-bust" case, for the first time, was able to cite the newly decided *Payton* decision in support of its *Davis, supra,* proposition. More importantly, however, in the case of *United States v. Phinizy,* 12 M.J. 40 (C.M.A.1981), the Court implied in its dicta that, absent exigent circumstances, the reasoning of *Jamison, supra,* as adopted by the Court in *Davis, supra,* also applies to any "buy-bust" operations in which both the sale and apprehension of a suspected drug dealer are expected to occur within the suspect's private quarters.

Based upon the particular facts of *United States v. Phinizy, supra*, the Court upheld the "warrantless" apprehension of an accused in his residence pursuant to a "buy-bust" operation, but it based this decision upon the following rationale:

> The facts of this case do not warrant a conclusion that Agent Early's field operation conduct rather than the nature of the appellant's drug business purposefully created these exigent circumstances. *See United States v. Curran*, 498 F.2d 30 (9th Cir. 1974).

*United States v. Phinizy, supra*, at 43.

According to defense the essence of this rationale from *Phinizy, supra*, lies in the words "exigent circumstances." My review of the facts in *Jamison, Davis*, and *Payton*, all *supra*, convinces me otherwise.

In each of these cases, prior to entering the suspect's quarters, entering agents had reason to believe that they would discover contraband inside the quarters, in addition to that which they might have expected to recover during a search incident to apprehension on the accused's person. The evil sought to be avoided by the rule prohibiting unauthorized entry into a private dwelling to apprehend a suspect in each of these cases, then, was not so much the spectre of in-quarters apprehensions, as the spectre that law enforcement agencies might well contrive such in-quarters arrests to circumvent the otherwise mandatory in-quarters search requirements dictated by the Fourth Amendment.

Consequently, I believe that when the Court, in *Phinizy, supra*, indicated its intention to apply *Jamison/Davis* rationale to future "buy-bust" cases, the above quoted language was meant to restrict the applicability of that rationale to "buy-bust" cases in which the government purposefully selects a suspect's quarters as the site at which a planned "buy" will occur.

## V

Interpreting this body of case law, I, first, conclude that, absent exigent circumstances, a valid apprehension authorization is necessary to apprehend an individual in his private dwelling. Secondly, I conclude that when a government law enforcement agency purposefully plans an operation, be it "buy-bust" or other, so as to necessitate an apprehension of a suspect in his private quarters, a "warrantless" apprehension flowing from that purposeful plan cannot be justified by exigent circumstances, since any "exigency" which existed at all, was one purposefully created by the agency, itself.

## VI

Here, as in *Phinizy, supra*, the Government did not purposefully plan its "buy-bust" operation so as to necessitate the apprehension of the accused in his private dwelling. To the contrary, under the facts of this case, the Government's plan was to apprehend the accused in the public domain of a base theater parking lot. It was the accused's connivance, not the Government's, that resulted in the "exigency" necessitating his apprehension in his private quarters.

Consequently, given the complexity of arrangements necessary for any "buy-bust" operation,* I find no fault in the Government's failure to obtain an arrest authorization during the two short hours it had to modify its operation in accordance with the "last minute" requirements levied upon it by the accused. Both the entry and apprehension in this case were justifiable as based upon exigent circumstances.

I concur in the majority's result.

---

* Essentially, the procedures utilized in "buy-bust" operations include providing a confidential informant with marked money and directing him to consummate a previously arranged purchase of a specified quantity of drugs from a suspected drug dealer, at a certain time and place. After inventorying all items on the informant's person, including the marked money, and secreting agents in the vicinity of the site at which the "buy" is to occur, the informant, who is kept under constant surveillance from the time he is provided with the money, proceeds to the prearranged site of the "buy". Upon a signal from the informant that the "buy" has been consummated, the suspected drug dealer is immediately "busted" or apprehended, and the marked money, presumably still on the suspect's person, is seized pursuant to a search incident to that apprehension.