**UNITED STATES**

v.

**Lieutenant Colonel Linda D. CARTER, Military Judge, Appellee,**

**Senior Airman David S. Jackson FR 435–21–4300, Real Party In Interest.**

**COMR No. 90A–04.**

U.S. Air Force Court of Military Review.

12 July 1990.

Appellate Counsel for the United States: Colonel Robert E. Giovagnoni, Captain Morris D. Davis and Captain Mary V. Perry.

Appellate Counsel for the Appellee: Colonel Richard F. O'Hair and Major Bernard E. Doyle, Jr.

Before BLOMMERS, KASTL and MURDOCK, Appellate Military Judges.

## OPINION

KASTL, Senior Judge:

The Government has appealed three of the military judge's rulings in this case under Article 62, UCMJ, 10 U.S.C. § 862. We uphold the judge's rulings.

### Factual Setting

On 4 December 1989, the Air Force Office of Special Investigations [OSI] at Norton Air Force Base, California, received a phone call from Airman First Class Eleanor Aguon. She related that Airman Jackson, the accused, had called her recently and claimed that he and his roommate had "gotten high" the previous weekend. No specific drug was mentioned.

She subsequently provided a sworn statement. Airman Aguon had earlier given the OSI details of both a phone conversation and a personal conversation with the accused during which he claimed to have possessed "crack" and "gotten high." Aguon also stated the accused offered her marijuana.

Airman Aguon never saw the accused use drugs. She never observed drugs or drug paraphernalia in the accused's possession or at his off-base residence, which she had visited several times. She was not involved with drugs herself. Jackson teased her frequently about controlled substances; Aguon acknowledged they would often "joke around" about drugs, but she thought perhaps he was serious this time. She failed twice to set up a meeting to couple the accused with drugs. In sum, her information about his possible drug involvement was uncorroborated.

OSI Agent Gaubatz believed Airman Aguon was a reliable informant based on her providing Air Force OSI with other sworn statements regarding illegal activities on base. (One of the individuals she named was subsequently discharged for use of marijuana). He related this opinion to Agent Riedel.

In the early evening on 4 December, and armed with the statement of Airman Aguon, Agent Riedel located Colonel Dennis D. Wood, the authorized search authority over Norton Air Force Base and its personnel. Agent Riedel informed Colonel Wood of the details of Aguon's statement. Without specifying her name, Agent Riedel informed Colonel Wood that his source had been proven reliable twice in the past. Riedel's intent was to accomplish simultaneous apprehensions of the accused and Airman Davila, his roommate, to preclude either forewarning the other.

Colonel Wood authorized the apprehension of both airmen. Agent Riedel then told Agent Sandoval to apprehend the accused. Meanwhile, Agents Riedel and Gaubatz planned to apprehend Airman Davila in Indio, California, where Davila was on temporary duty.

Agents Riedel and Gaubatz apprehended Davila in a motel room and took him to the Indio Police Station for questioning. Airman Davila eventually implicated the ac-

cused in illegal drug use. Airman Davila died prior to this trial.

Regarding the situation at the accused's house, Agent Riedel stated he was unaware at that time of the requirement to obtain an arrest warrant for a military member's apprehension in off-base quarters. Mil.R.Evid. 315(c); R.C.M. 302(e)(2); *United States v. Davis*, 30 M.J. 718 (A.F.C. M.R.1990). Riedel did not brief Agent Sandoval concerning procedures for apprehending the accused or what to do if the accused refused to come out of his home or fled back inside. Agent Sandoval stated that he planned not to apprehend the accused in his house and that he intended to leave if Jackson refused to come out.

Agent Sandoval understood that an authorization from the base commander existed. He was apparently unaware of the need for a civilian arrest warrant.

Two security policemen were involved in the apprehension. Sergeant Skeeter thought that they had authority from the commander to apprehend. Neither was aware of the need for a civilian arrest warrant. Colonel Wood was not aware of the arrest warrant requirement either. As the authorities prepared for the apprehension, Agent Sandoval was attired in a blue coat and a "raid jacket" with OSI insignia on it. The two security policemen, Sergeants Skeeter and Sheldon, wore civilian clothes. Sergeant Skeeter was wearing a raid jacket showing law enforcement insignia; Sergeant Sheldon was not.

Between about 2015 and 2115 hours, Sandoval, along with Sheldon and Skeeter, arrived at the residence of the accused, a four-plex apartment in San Bernardino. Sandoval knocked on the door frame. When the accused opened the door, Sandoval identified himself, using his credentials, and stated his name and his OSI affiliation.

Sandoval asked the accused if he was Senior Airman Jackson. The accused answered, "Yes," and asked what was going on. Agent Sandoval asked the accused to "step outside" the house. The accused came outside the front door and stood on a three foot by three foot concrete step porch about two steps from the door. Sandoval told the accused he was under apprehension. Sandoval and the two security policemen were two to three feet from the accused at this time. Then Sergeant Skeeter took over the apprehension. He moved the accused away from the porch and handcuffed him. Prior to the apprehension, none of the three law enforcement agents went into the house.

Sergeant Skeeter did a pat-down search of the accused and handcuffed him. Then Agent Sandoval and Sergeant Sheldon walked through each of the rooms in the house for a protective sweep to determine if anyone posed a threat to the apprehending agents.

In a matter of two to three minutes, Agent Sandoval and Sergeant Sheldon completed this clearing process. They returned to the living room of the house to find Sergeant Skeeter and the accused present. Various items of drug paraphernalia were found in the house. Both the accused and his roommate, Airman Davila, eventually confessed to drug-related misconduct.

The military judge ruled against the Government on both the probable cause and apprehension issues. She found in pertinent part that:

1. The information provided by Airman First Class Aguon was insufficient to provide the commander probable cause for the accused's apprehension; therefore, that apprehension was illegal.

2. By asking the accused to step outside his apartment the agents "crossed the threshold" and therefore effectuated an unlawful warrantless apprehension.

3. Since the apprehension was unlawful, the protective search, which revealed evidence of a crime, was also unlawful.

4. The admissions made at OSI after proper rights advisement were tainted by the earlier unlawful apprehension. There were no intervening circumstances to attenuate the taint. Had the apprehension been lawful,

the subsequent admissions would have been admissible.

5. Had the apprehension been lawful, the items of evidence and the accused's admissions would have been admissible. The evidence found adequately corroborated the accused's admissions.

6. Airman Davila's admissions concerning the accused were inherently suspect and bore no indicia of reliability; they were inadmissible.[1]

7. The accused's admissions to Aguon were not corroborated and were thus inadmissible. Had the apprehension been lawful, the items seized would have corroborated the statements to Aguon.

### Standard on Review

In determining this appeal, we must first decide whether the military judge's findings of facts were correct. If none of her findings are *clearly erroneous*, we are bound by them. *United States v. Burris*, 21 M.J. 140 (C.M.A.1985) *United States v. Postle*, 20 M.J. 632, 636 (N.M.C.M.R.1985). We hold that the military judge's excellent and well-crafted findings satisfy this standard. *See generally* Cooley and Scott, *"The Role of the Prosecutor in Government Appeals,"* Army Lawyer, August 1986 at 38.

Our next step is to determine whether, as a matter of law, the military judge correctly employed the proper legal standards. Article 62(b), UCMJ; *United States v. Lewis*, 19 M.J. 869 (A.F.C.M.R.1985). We so hold.

### I. Probable Cause

As to probable cause, we must apply the "totality of the circumstances test" of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The *Gates* test clearly governs in a military setting. *United States v. Queen*, 26 M.J. 136, 139

(C.M.A.1988); *United States v. Tipton*, 16 M.J. 283 (C.M.A.1983).

Determining when "probable cause" exists can be compared to a legal game of hunt-the-rabbit. Whether the Government's hounds will trap the bunny at the end of the chase is always an exciting question. The Government argues that the volunteer-informant in this case was an accountable Air Force member with a clean record; she had provided useful information in the past. This ought to provide sufficient indication of reliability to convince us the military judge erred, says the Government. *See generally United States v. Wood*, 25 M.J. 46 (C.M.A.1987). We think not. Questions of admissibility of evidence lie within the trial judge's sound discretion. *United States v. Davis*, 30 M.J. 718 (A.F.C.M.R.1990); *United States v. Jones*, 25 M.J. 567, 569 (A.F.C.M.R.1987); *United States v. Lewis*, 19 M.J. 869 (A.F.C.M.R.1985). We hold that the military judge did not err on the facts before us.

The flaw here is not the informant's reliability, but, rather, the lack of substance in the information she possessed. In sum, the Government loses principally *because the informant failed to observe the criminal behavior personally*. According to the informant's testimony, the appellant was an avid jokester who made her laugh. He was seldom serious. His "boasting" about drug use or possession was unsubstantiated. The informant was communicating gossip or rumor—she neither saw nor observed anything to link the appellant to drugs.

This case is fatally flawed, falling short of the requirements set forth in *Wood*, the flagship case cited by the Government. *See McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Chick*, 30 M.J. 658, 662 (A.F.C.M.R.1990) (official must have "more than an inkling for a warrant to pass judicial muster"). *See also State v. Baca*, 97 N.M. 379, 640 P.2d 485 (1982); *State v. Smith*, 350 So.2d 1178 (La.1977); LaFave, *Search and*

---

1. Airman Davila recanted his confession entirely in his sworn testimony at the Article 32 investigation. Davila had died by the time of this court-martial.

*Seizure,* Sec. 3.3(d) at 663–667 and Sec. 3.4(b) at 730–731.[2]

## II.   Unlawful Apprehension

■ As to the second matter: The military judge made detailed specific findings relative to the apprehension at the appellant's quarters. Amplifying the findings detailed above, she found as a matter of fact that when Agent Sandoval and the two security policemen knocked on the door of the appellant's home, they addressed him by name *and used their authority in asking him to come out.* To the military judge, "those agents crossed the threshold established by the Fourth Amendment. They had no warrant; they had no consent; there were no exigent circumstances. The letter and the spirit of the law were violated at this time."

The Government argues that the military judge made new (and wrong!) law on this point. The crux of their argument is that police authorities did not actually enter the appellant's home to apprehend and the trial judge's theory of "constructive entry" was plain error. They cite the very recent case of *New York v. Harris,* —— U.S. ——, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) to undergird their position.

Despite *Harris,* we are unable to say the military judge erred. *United States v. Ayala,* 22 M.J. 777, 790 (A.C.M.R.1986), *aff'd.* 26 M.J. 190 (C.M.A.1988); *see also United States v. Davis,* 13 M.J. 671 (A.F.C. M.R.1982).

Professor LaFave notes the "metaphysical subtleties" when an arresting officer testifies that the defendant was "in" the doorway rather than "at" it, "on" the threshold rather than "by" it. *See* LaFave, *Search and Seizure,* Sec. 6.1(e) at 590. Was the apprehension good here? Suffice it to say there is firm support on both sides of the question of whether this apprehension passes constitutional muster. *See Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Duncan v. Storie,* 869 F.2d 1100 (8th Cir.1989); *United States v. Carrion,* 809 F.2d 1120 (5th Cir.1987); *United States v. Al–Azzawy,* 784 F.2d 890 (9th Cir.1986); LaFave, *Search and Seizure,* Sec. 6.1(e) at 593.

We do not find *New York v. Harris* fatal to the accused. *Harris* clearly does not govern factual situations—such as that here—where probable cause is lacking. The *Harris* majority specifically cautions that its holding will not affect cases such as *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). *Dunaway* (like the present case) involved a situation with no probable cause for arrest at the appellant's home.[3] We cannot say the military judge erred in her ruling on the basis of *Harris.*

## III.   Other Matters

■ Applying the applicable standard on review for Article 62 appeals, we find that the military judge did not err in holding that the statement of Senior Airman Davila was inadmissible. *United States v. Wind,* 28 M.J. 381, 385 (C.M.A.1989); *United States v. Koistinen,* 27 M.J. 279 (C.M.A. 1988); *United States v. Fisher,* 28 M.J. 544 (A.F.C.M.R.1989).

**2.** One Federal appeals judge has noted the difficulties of attempting a meaningful appellate review under the approach of *Illinois v. Gates:* "A subjective, generalized standard of reasonableness creates a jurisprudence of individual judicial reactions in place of predictable and binding precedent. Reasonable, undefined, is no standard at all for judging conduct ... Reasonableness, in short, only poses the question." Wald, *The Unreasonable Reasonableness Test for Fourth Amendment Searches,* 4 Crim.J. Ethics 2, 89 (Spring 1985).

Judge Wald makes a telling point. It is difficult to fault a military trial judge in the post-*Gates* era on a question of probable cause. A quick survey of case law reveals precedents which are irreconcilable as to "how much is enough" to create sufficient probable cause. *See generally* the excellent analysis in *United States v. Davis,* 30 M.J. 718, 720 (A.F.C.M.R. 1990) and cases cited.

**3.** How is *New York v. Harris* to be construed in light of the contemporaneous *Minnesota v. Olson,* —— U.S. ——, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), which appears *contra?*

The appeal is denied and the record of trial is returned to the convening authority.

Senior Judges BLOMMERS and MURDOCK concur.